George MILLER, Sr., Individually and as next friend for George Miller, Jr., Appellant,

v.

BOCK LAUNDRY MACHINE COMPANY, Appellee.

No. 1004.

Court of Civil Appeals of Texas, Tyler.

May 12, 1977.

Rehearing Denied June 9, 1977.

Blake Bailey, Wellborn & Houston, Henderson, for appellant.

Earl Sharp, Sharp, Ward & Ross, Longview, for appellee.

McKAY, Justice.

This is a products liability case in which George Miller, Jr., age 11, had his left arm amputated near the shoulder after the arm became entangled in a piece of laundry equipment. The laundry machine was known as a Bock Centrifugal Extractor, was manufactured by appellee, Bock Laundry Machine Co. (Bock), and was located and being used at the Blue Ribbon Cleaning Center in Henderson operated by Luther Jenkins (Jenkins). Appellant brought suit against Jenkins, United Furniture Co. (United), the seller of the machine to Jenkins, and Bock, alleging that the machine was defective in design and in manufacture and operation because the cage or basket inside the extractor continued its centrifugal rotation at a high rate of speed after the motor was disengaged and the lid raised. Bock by its answer alleged that there was no defect in design or manufacture, but if the machine was dangerous it resulted solely from unusual wear and tear use by customers and owners over a long period of time after its manufacture, that it was not operated and maintained in accord with good practices recognized in the general field and use of such equipment, and that any danger or defect claimed resulted from the failure to properly maintain, inspect and repair the equipment and so operating it or allowing it to be used by the public without proper maintenance and repair. Bock further alleged the injured minor was negligent and his parent was negligent, and that if the machine was dangerous because of lack of maintenance, inspection or repair it had no notice of same.

After Bock's motion for instructed verdict was overruled the court submitted issues to the jury and the jury found:

1. The Bock laundry machine was (a) defectively designed, and (b) defectively manufactured at the time it left the Bock plant.

1A. Such defect was a producing cause of the injury to George Miller, Jr.

2. The laundry machine was still in such defective condition when sold by United to Jenkins.

2A. United expected the machine to be used by Jenkins' customers without substantial change in its condition.

3. United failed to properly inspect the laundry machine in question prior to selling it to Jenkins, but, (3A) such failure was not a proximate cause of the occurrence in question.

4. United failed to furnish operating instructions and warnings at the time it sold the machine to Jenkins and, (4A) such failure was negligence, but (4B) was not a proximate cause of the occurrence in question.

5. On the occasion in question the laundry machine was in such condition that the lid of the machine could be raised by an ordinary user while the spinning basket was still rotating, and (5A) Bock knew, or should have known in the exercise of ordinary care, of such fact, and (5B) Bock failed to properly warn the public using such machine of such fact which was (5C) a proximate cause of the occurrence in question.

6. United did not know, nor should it have known, of such fact.

7. George Miller, Jr., suffered damages in the sum of $250,000.00 and reasonable medical and hospital care expenses of $1,000.00.

9. Neither George Miller, Sr. nor his wife was negligent in failing to exercise parental supervision and control over George Miller, Jr.

10. George Miller, Jr., was not negligent in playing or tampering with the lid of the machine or forcing the lid open and placing his arm into the extractor.

11. Jenkins was negligent (a) in operating and maintaining the extractor machine or in permitting it to be operated by the public without proper maintenance and repair; (b) in failing to inspect the machine; (d) in failing to comply with written instructions placed on the name plate of the machine; and (e) in failing to obtain a manual of instructions; but (11A) none of the above was a proximate cause of the occurrence in question.

12. United was not engaged in the business of selling commercial laundry extractors at the time the machine in question was sold to Jenkins in 1967.

14. George Miller, Jr., did not misuse the extractor.

At the beginning of the trial Jenkins settled plaintiff's claim against him for the sum of $45,000.00 under a compromise agreement.

After a hearing the trial court granted Bock's motion for judgment non obstante veredicto on the ground that the evidence raised no issue of fact and that a directed verdict would have been proper, and rendered judgment that plaintiff take nothing against Bock or against United.

Appellant by his one point of error contends the trial court erred by determining that the evidence raised no issue of fact and by granting a judgment non obstante veredicto based upon such finding. The trial court may render judgment non obstante veredicto if a directed verdict would have been proper. Rule 301, T.R.C.P. To sustain the action of a trial court in granting a judgment notwithstanding the verdict there must be no evidence having probative force upon which the jury could have made the findings relied upon. *Burt v. Lochausen*, 151 Tex. 289, 249 S.W.2d 194, 199 (1952); *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547, 550 (1962). We must, therefore, examine the record to determine whether there is evidence having probative force which supports the findings of the jury.

The record reveals that the machine in question was manufactured by Bock in 1957, sold to Hammond Laundry Cleaning Machinery Co., Shreveport, and shipped to Leon Crim Furniture Co., Henderson, on February 6, 1957. Bock had no further knowledge of the machine until notified of the accident and injury to George Miller, Jr.

Jenkins testified he bought the machine in July, 1968, from United, and United did not furnish or provide him with any operating, repair or maintenance instructions, nor did he receive any such instructions from Bock or anyone. He further testified there was a plate attached to the top of the machine with the words printed on it: "Read instructions for operation and care of machine before using," but there were no other instructions or warning that when the lid was opened the inner basket would continue to spin. Jenkins said he never oiled the machine. Jenkins further testified that from the time he acquired the machine the basket continued to spin after the lid was raised but "how fast, I couldn't say. Not too fast," and the machine was in that condition when the injury occurred. He said "it worked the same way when it was installed as it did when we finished with it." Jenkins tested the machine the day after the accident, and he testified that when he raised the lid the basket continued to spin faster than usual. He said he knew there was some type of safety device on the machine that prevented the tub from spinning with the lid open, but he did not know how it worked.

George Miller, Jr., age 11, at the direction of his mother to remove clothes from the machine, turned off the switch and opened the lid with his left hand. He saw the inner basket still rotating and changed to his right hand to hold the lid. His left arm was then pulled into the spinning basket and severed near the shoulder.

The witness L. A. Stern, a consulting engineer and a registered professional engineer in four states, testified as an expert for appellant. He had a college degree in

Chemical Engineering, and he had been employed by the Water Department of the City of Dallas, the ordinance plant operated by the Federal Government in Texarkana during the war, and by Pittsburg Testing Laboratories from the early 1940's to 1970. He was general manager of Pittsburg Testing, where he had tested machinery, pipe, locomotives and component parts. Since 1970 he had been a consulting engineer and had tested products for quality control for many companies.

Shortly after the injury in question here Stern traveled to Henderson and saw the Bock extractor machine at Jenkins' laundry where the accident occurred. He turned on the machine for one-half to one and one-half minutes, then turned it off and lifted the lid. The basket continued to spin with great velocity which he later measured to be 1600 to 1700 rpms, by his description equivalent to 50 to 60 miles per hour. On later, more detailed examination and testing he testified the basket continued to spin for 24 seconds after the power was turned off and the lid raised. Stern testified that the safety device would not engage and operate to stop the spinning of the basket when the lid was raised because the rubber pads, upon which most of the operating mechanism rested, had deteriorated or shrunk causing the machine to slip down. Such dropping caused a rod which should have contacted a collar to go completely over the collar and fail to engage the safety device for the lid. He testified that these rubber pads could have deteriorated because of use, age, time or because they were attacked by some petroleum product such as oil, gasoline or grease. He further said that there was a design defect because the pad could have been made of material that would not deteriorate—that, therefore, there was a manufacturing defect which created an unreasonable risk of harm to those using the machine in the future. Stern suggested that neoprene pads or metal springs would not have deteriorated, that a safety device should work as long as the machine with which it functions is operable, and that a timer or an electro-magnet safety device could have been used.

The witness John Vivian Perry, Jr. was a Professor of Mechanical Engineering at Texas A. & M. University. He had a B.S. degree from Virginia Polytechnical Institute, and his Masters and Doctors degrees from Texas A. & M. He was a Texas licensed professional engineer, and his teaching specialty was machine designs. Perry testified that the rubber bumpers or pads had deteriorated and allowed the machine to drop enough to prevent the safety device from operating, and that the deterioration could have resulted from oil from nearby openings for oil, or from ozone, a substance given off by electric motors which is deteriorative to rubber, or from a combination of oil and ozone plus the heat from the motor. Perry further testified that it was a bad design and that in his opinion the safety plunger should have been moved toward the center of the safety disc rather than contacting it on the side.

John Clement, President of Bock, testified he had been with the company since 1938 except for four years when he was in the military service during World War II. He said he received a B.S. degree in Mechanical Engineering from Cornell University and had taken continuing adult education programs at the University of Toledo. Clement testified that the sole product manufactured by Bock is the centrifugal extractor; that a patent was applied for and issued for the safety devices which are to prevent access to the spinning parts; that it "was a dynamic safety device with a safety disk, and the safety balls lifting the disk, causing an interference with a plunger that translated mechanically up to the cover," and it was not possible to raise the lid while the basket was still spinning or rotating; that the machine could not be turned on with the lid open, and after the lid was closed and the machine was running the lid could not be opened; that when the machine was turned off there was a braking device which applied an asbestos brake lining against a brake plate, and when the brake was applied it lifts up to a brake disk to stop the rotation. He said the brake lining will wear.

Clement further testified that upon inspection of the machine involved here he observed considerable metal on metal wear, and in his opinion the brake friction facing was not present or was worn out, and the fiberboard had been removed, but he saw nothing else wrong with it. He said it was a safe design for a brake lining and a safe braking system; that the lid is prevented from being opened while the basket spins after the switch is off and the brake is applied by two three-quarter inch metal balls thrown out by centrifugal motion on an inclined plane that sets in motion a safety plunger which blocks against a lip on the safety disk which results in locking the lid as long as the basket spins. He stated that at about 75 rpms the balls would re-track back down and the basket will then turn less than one-half revolution.

In further testimony Clement said installation and instruction material was furnished and accompanied each machine as it was sold, and there was a manual of instructions which contained information on maintenance including "Brake friction facing and rubber mountings should be inspected at least annually and replaced when necessary." In the same manual which was furnished with each extractor in 1957 was a list of "Parts Most Frequently Required," and such list included "the A260 bumper rubber, a set of four," and "the A263 brake friction facing". He said the wearing of the rubber bumpers or pads of one-eighth inch would not cause the safety plunger to miss the safety disk; that if the rubber bumper or pad was depressed one-eighth inch it might drop the safety disk only approximately one one-hundredth of an inch, and that would not affect the safety plunger and safety disk.

In testing this type machine Clement said it was found that it took 20 seconds for the braking device to stop the basket from rotating, and in the operating and maintenance instructions it was recommended that if it took more than 20 seconds the brake lining should be replaced. He said that the company had considered springs instead of rubber and found them to be dangerous, and that in tests and experiments he had never found a rubber pad deteriorated from oil escaping from an oil receptacle near the front of the machine.

Clement further testified that the dynamic safety device has been in the laundry machine industry since 1923, and to his own knowledge since 1938, that it is used by all the manufacturers in the industry making the same type of equipment, that he considered it to be a safe design and free of defect and the best safety device available for the extractor; and that there was no better material or no better design at the time it was produced. He said that in 1957 each machine, before it left the factory, was tested by operating it—starting it, stopping it, and seeing that the safety devices were all in order; and that it was tested for sound, for leakage and for scratches. He further said no notice was ever received by Bock from Leon Crim Furniture, United or Jenkins about any problem with the machine.

■ A manufacturer or a dealer who makes or sells a defectively designed or defectively produced product which is unreasonably dangerous to the user or consumer is subject to liability for physical harm thereby caused. *Rourke v. Garza*, 530 S.W.2d 794, 798 (Tex.1975); *Henderson v. Ford Motor Co.*, 519 S.W.2d 87, 92, 93 (Tex. 1975); *Ford Motor Co. v. Russell & Smith Ford Co.*, 474 S.W.2d 549, 557 (Tex.Civ.App. —Houston [14th Dist.] 1971, no writ); Restatement of Torts, sec. 402A, 2nd Ed. (1965).

■ There is an abundance of evidence concerning the condition of the extractor at the time of the accident; however, the crucial questions presented here are (1) whether the design was defective at the time the machine was manufactured by Bock, and (2) whether it was defectively produced by Bock. The reason given by the expert witness Stern that the design was defective was that the rubber pads were made of rubber rather than of some other material. He suggested neoprene would have been preferable because it would not have deteriorated and is resistant to petroleum prod-

ucts while rubber is not. Stern's testimony is based upon the fact that *the rubber pads had worn because of use or of age or of time or because they were attacked by some petroleum product.* Stern did not testify that the safety device was defectively designed so that it caused the machine to be inherently or unreasonably dangerous at the time it was produced. The effect of his evidence is that eighteen years after the extractor was manufactured, and after it had been used for that period, he had some criticism of the material used in the pads. Likewise, there is no testimony by Stern of defective manufacture of the extractor; his criticism of the use of the rubber pads was not evidence that the extractor was defectively produced, nor that it was unreasonably dangerous to the consumer or user at the time it left Bock's plant.

The other expert witness Perry testified that the rubber bumpers or pads had deteriorated which permitted the machine to drop enough to prevent the safety device from operating, and it was his opinion that the rubber pads could have deteriorated from oil or ozone or both plus heat from the electric motor. His criticism was that had the safety plunger been attached to the same metal frame as the disk into which the plunger was thrust it would have been a better design. However, he did not say that the machine was defectively designed or manufactured at the time it left Bock's plant; nor did he testify that the machine was unreasonably dangerous to the consumer or user at that time.

In reviewing the record presented here we believe the reasoning of *Henderson v. Ford Motor Co.,* supra, is applicable here. We paraphrase the *Henderson* case language at p. 92: The extractor was undoubtedly dangerous to those who used it at the time of the accident to George Miller, Jr., on September 1, 1975. The question is whether this Bock extractor, and all extractors of the same design, were unreasonably dangerous from the time of manufacture. Did some feature of the form or material or operation of the extractor threaten harm to persons using the extractor to the extent that any extractor so designed would not be placed in the channels of commerce by a prudent manufacturer aware of the risks involved in its use or to the extent that the extractor would not meet the reasonable expectations of the ordinary consumer or user as to its safety? We think it did not.

In discussing the general legal standard on design defects the writers in 14 Houston Law Review p. 12, The Law of Strict Tort Liability in Texas, analyze the Henderson case in this language:

> "The court concluded that if all housings so designed were unreasonably dangerous, then the product would be defective. The court suggested a bifurcated test to resolve the question of whether a product was unreasonably dangerous. If the automobile would not be placed in the channels of commerce by a prudent manufacturer aware of the risk involved in its use or if the automobile would not meet the reasonable expectations of the ordinary consumer as to its safety, then the product is unreasonably dangerous. Concluding that the gasket was not defectively designed, the Texas Supreme Court declared that bare criticism that 'the design could be better' was insufficient to establish a defective design. A manufacturer is not expected to design every aspect of a product in the best way that is scientifically possible."

■ The testimony of Stern and Perry indicates that there were alternatives in design or materials, which, had they been adopted or used, might have prevented the accident. Such a showing, standing alone, is insufficient to establish liability. *Weakley v. Fischbach & Moore, Inc.,* 515 F.2d 1260, 1267 (5th, 1975); *Henderson v. Ford Motor Co.,* supra, at p. 93. The *Weakley* opinion contains the following language at p. 1267:

> "It is one thing to show that the defendant might have designed a safer product; quite another to show that the product he did design was unreasonably dangerous. The defendant is not obliged to design the safest possible product, or one as safe as others make or a safer

product than the one he has designed, so long as the design he has adopted is reasonably safe."

 The manufacturer is not required to design every part to be the best that science and engineering can produce or to guarantee that no harm will befall the user. *Henderson v. Ford Motor Co.*, supra, at p. 93.

In *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914, 922, 923 (Sup.Ct.Pa., 1974), is found this language:

"Section 402A does not make the manufacturers and sellers insurers of their products. They are not liable for defects caused by normal wear-and-tear or misuse of a product by its purchaser, however foreseeable these events may be.

. . .

" . . . The age of an allegedly defective product must be considered in light of its expected useful life and the stress to which it has been subjected. In most cases, the weighing of these factors should be left to the finder of fact. But in certain situations the prolonged use factor may loom so large as to obscure all others in a case. . . . "

Comment g. of Sec. 402A, Restatement, Torts 2d (1965), reads as follows:

"The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained."

The recent Supreme Court case of *General Motors Corp. v. Hopkins*, 548 S.W.2d 344 (Tex.1977) may be distinguished from the case at bar since it is concerned with alterations and misuse of the product as defenses when such are concurring causes with a defect.

After carefully reviewing all of the evidence we are of the opinion that there was no issue of fact for the jury on the question of defective design or defective manufacture, and the trial court acted properly in granting the motion for judgment notwithstanding the verdict.

Judgment of the trial court is affirmed.