George MILLER, Individually and as
next friend for George Miller,
Jr., Petitioner,

v.

BOCK LAUNDRY MACHINE
COMPANY, Respondent.

No. B–6857.

Supreme Court of Texas.

Dec. 30, 1977.

Rehearing Denied July 26, 1978.

Wellborn & Houston, Rex Houston, Henderson, for petitioner.

Sharp, Ward & Ross, Earl Sharp, Longview, for respondent.

BARROW, Justice.

This is a products liability case. George Miller, Jr., then eleven years old, had his left arm severed at the shoulder when it became caught in a centrifugal extractor, a type of clothes dryer manufactured by Bock Laundry Machine Company. At the time of the accident, it was installed in the Blue Ribbon Cleaning Center, a laundromat in Henderson. George Miller, Sr. filed suit individually, and as next friend of George Jr., seeking to recover damages jointly and severally from Bock; from Luther Jenkins, d/b/a Blue Ribbon Cleaning Center; and from United Furniture Company, who had sold the equipment to Jenkins. Miller settled with Jenkins just before trial for $45,000 and agreed to hold Jenkins harmless from Bock's plea for indemnity or contribution.

The jury found that the extractor was defectively designed by Bock and that the defect was a producing cause of the boy's injury. The jury also found that Jenkins and United Furniture were guilty of negligence, but that such negligence was not a proximate cause of the occurrence in question. The trial court concluded that there was no evidence to support the jury's findings that the extractor was defectively designed and granted Bock's motion for a take-nothing judgment non obstante veredicto. Miller perfected an appeal as to Bock and the court of civil appeals affirmed. 551 S.W.2d 775. We reverse the judgments of the lower courts and render judgment on the jury verdict.

To overrule the action of the trial court in granting the motion for judgment non obstante veredicto, we must determine that there is more than a scintilla of evi-

dence upon which the jury could have made the findings against Bock. In making this determination, we must review the evidence in its most favorable light, considering only the evidence and inferences which support the findings, and rejecting the evidence and inferences contrary to the findings. *Martinez v. Delta Brands, Inc.*, 515 S.W.2d 263 (Tex.1974); *Douglass v. Panama, Inc.*, 504 S.W.2d 776 (Tex.1974).

The extractor was designed and manufactured by Bock. It was designed to extract water from the clothes by means of the centrifugal force generated by the clothes basket rotating at about 1,725 revolutions per minute, the equivalent of over 60 miles per hour. This particular machine was originally sold by Bock in 1957 to Hammond Laundry Cleaning Machinery Company of Shreveport, Louisiana, and shipped directly to the Crim Furniture Company in Henderson. Jenkins, who operated several laundromats in and around Henderson, was contacted by a salesman for United Furniture Company around the latter part of July, 1968, in regard to the purchase of some laundry equipment, including the Bock Centrifugal Extractor, which had been used by a Mr. Neal, who was terminating his laundry business. The record does not show how ownership passed from Neal to United Furniture. The extractor was purchased by Jenkins from United Furniture and installed at the Blue Ribbon Cleaning Center. No operating instructions or equipment manual were with the extractor or furnished to Jenkins. The machine was placed in operation and apparently worked satisfactorily until the unfortunate accident which is the basis of this suit.

On September 1, 1975, George Jr. accompanied his mother to the Blue Ribbon Cleaning Center for the purpose of helping with the family laundry. While there, she told George to remove a load of clothes from this extractor. George turned off the machine and, after a short delay, opened the lid. The extractor was equipped with a safety device to prevent the lid from opening while the basket was still spinning. However, when George lifted the lid of this machine, the safety device did not operate.

Although the lid opened easily, the basket was still rotating at a very high rate of speed. George's arm was caught in the machine and severed almost immediately. There was testimony that the energy created by the rotating basket was so great it could have actually sucked the boy's arm into the machine when the lid was opened.

The evidence is uncontradicted that the safety device on the machine was defective at the time of the accident and that the defect was a producing cause of George's injuries. It is now firmly established in Texas that a manufacturer is liable for unreasonably dangerous products— whether designed defectively and manufactured as designed, or whether designed perfectly, but defectively manufactured. *Henderson v. Ford Motor Co.*, 519 S.W.2d 87 (Tex.1974); *Otis Elevator Co. v. Wood*, 436 S.W.2d 324 (Tex.1968); Restatement (Second) of Torts §§ 395, 398 (1965). A defect in a product at the time of an accident is not alone enough to render the manufacturer strictly liable. Therefore, the question before us is whether there is evidence to support the jury finding that the machine was defectively designed at the time it was sold, and that the defect was a producing cause of the failure of the safety device on September 1, 1975.

At trial two expert witnesses testified that they had examined the machine. Mr. Stern, a licensed professional engineer with nearly 40 years experience as a private consulting engineer, examined the machine at the request of Miller two or three days after the accident. Dr. Perry, a licensed professional engineer who has taught mechanical engineering at Texas A & M University since 1948, examined the machine at the request of Jenkins a few days after the accident and also at his laboratory in Bryan. Both testified directly and unequivocally that the failure of the safety device was the result of defective design.

Bock urges that the direct testimony of the two experts is without probative force in that the evidence conclusively establishes that the extractor, specifically the safety

device, was not defective at the time of manufacture, and in fact, it had worked satisfactorily for over 18 years. It urges it was thus entitled to a directed verdict under the rule established in *Henderson v. Ford Motor Co., supra.* The issue posed in *Henderson* can be paraphrased to apply to this case as follows: Did some feature of the form or material or operation of the extractor threaten harm to persons using the machine to the extent that any extractor so designed would not be placed in the channels of commerce by a prudent manufacturer aware of the risks or to the extent that the extractor would not meet the reasonable expectations of the ordinary consumer or user as to its safety? See also *General Motors v. Hopkins,* 548 S.W.2d 344 (Tex.1977).

To answer this question, we must consider the expectations of the manufacturer and the nature of the defect. Mr. Clement, the president of Bock, testified that these extractors were manufactured to last for many years—certainly more than 18 years with proper service and maintenance. Some were in service that were 30 to 40 years old. He also stated that the safety device is supposed to last the life of the machine. The two experts emphasized that the minimum requirement of any safety system is to outlast the useful life of the machine. This evidence supports an inference that this extractor was designed with the intent it would still be in service on September 1, 1975. Clement admitted that an unreasonable risk of harm to the user would exist if the lid could be raised while the basket was still spinning.

To understand the nature of the defect, one must understand the operation of the safety device. The hinged lid of the extractor is connected at the back to a metal rod which runs down the side of the machine. This vertical rod is then linked by a lever to a spring-loaded rod which runs horizontally underneath the clothes basket. If the lid is raised, the vertical rod is necessarily pushed down, which in turn moves the horizontal rod. However, when the basket begins to rotate, the centrifugal force created raises a metal collar up, along the axle on which the basket rotates, into a position behind the horizontal rod. This prevents the rod from moving and the lid from opening. Most of the operating mechanism as well as the clothes basket is a self-contained unit apart from the exterior housing to which the safety rods are attached. This mechanism is connected to the housing only at a ledge or rim which runs around the inside of the housing near the bottom. To prevent noise and vibration, there are four rubber pads on this ledge on which the operating mechanism rests. The two expert witnesses testified that the failure of the safety device to operate on this extractor was brought about as a result of a deterioration or shrinking of one of the pads which caused the unit containing the operating mechanism to slip down about an eighth of an inch. This allowed the rod to pass completely over the collar, permitting the lid to be raised even though the basket was rotating.

These witnesses expressed the opinion that the design was defective in that rubber was used for the pads despite the fact that rubber was known to deteriorate when in contact with oil and the ozone given off by the electric motor. One of the rubber pads was located close to the tube where the machine was oiled before it left the factory and was thus very likely to get oil drops on it. This pad, on which traces of oil were found, had deteriorated appreciably more than the other pads.

While Clement did not contradict the testimony of the two expert witnesses, he emphasized that this type safety device had been successfully used for years in the laundry industry. The expert witnesses testified, however, that a prudent manufacturer in 1957 should have made the pads of neophrene or chloroprene in lieu of rubber in that these products were known to be impervious to oil deterioration. There was also testimony that, in any event, an electrically operated magnetic or time latch should have been attached to insure that the lid could not be opened while the machine was running.

Bock also urges that the defect was brought about by lack of any type of maintenance by Jenkins during the seven years he owned the extractor. Issues were submitted to the jury to establish this contention. Although the jury found that Jenkins was negligent in failing to inspect the extractor and in failing to obtain a manual of instructions, it found that none of such acts was a proximate cause of the occurrence in question. No complaint is here made of these findings. Nor can it be said that these essential findings are established as a matter of law. A prudent manufacturer could anticipate that the manual of instructions would become separated from the machine over the years, yet there was nothing printed on the extractor itself which called attention to the necessity for inspecting the rubber pads to prevent this unreasonable risk of harm to users. The pads could not be seen without dismantling the machine or, at least turning it over on its side and removing the housing. In the meantime, the extractor worked satisfactorily and there was nothing to alert Jenkins to the impending failure.

■ We conclude that there is evidence, and clearly more than a scintilla, to support the findings of the jury that the extractor was defectively designed and that this defect was a producing cause of the injuries to George Miller, Jr. Therefore, the trial court erred in granting Bock's motion for judgment non obstante veredicto and entering the take-nothing judgment.

■ When a trial court has entered judgment non obstante veredicto, and an appellate court concludes that this was error, it must reverse the judgment of the trial court and enter judgment in harmony with the verdict, unless the respondent presents by cross-points grounds sufficient to vitiate the jury's verdict or to prevent affirmance of the judgment had one been entered on the verdict. *Jackson v. Ewton*, 411 S.W.2d 715 (Tex.1967).

Bock filed six cross-points in the court of civil appeals whereby it complains of (1) the exclusion from the jury of evidence of the settlement made by Jenkins with the Mil-

lers; (2) the refusal to grant a mistrial because of a question by Jenkins' attorney to Bock's president regarding an alleged similar accident; (3) and (4) improper argument by Miller's attorney; (5) exclusion of evidence offered by Bock; and (6) submission of the question of design defect by general issue. All of these cross-points are within our jurisdiction.

■ Bock urges that the trial court committed reversible error in refusing to admit evidence showing that Jenkins had settled Miller's suit against him and that he had been effectively indemnified from further loss by Miller. 'In *General Motors Corp. v. Simmons*, 558 S.W.2d 855 (Tex.1977), we held that it was reversible error to exclude evidence of a "Mary Carter" settlement agreement whereby the settling defendant acquired a direct financial interest in plaintiff's lawsuit. In so holding, we distinguished that type of settlement agreement from an ordinary settlement agreement which is properly excluded from the jury. The settlement agreement entered into here was not a "Mary Carter" agreement because Jenkins did not acquire a financial interest in Miller's recovery against Bock. Accordingly, the trial court did not err in excluding evidence of this settlement agreement. *McGuire v. Commercial Union Insurance Co. of New York*, 431 S.W.2d 347 (Tex.1968).

■ Bock asserts by its second cross-point that the trial court erred in not granting a mistrial because counsel for Jenkins asked Clement if he did not know of a similar accident which had occurred in Odessa, Texas, prior to the accident in question. This question was probably invited by the testimony of Clement on direct examination regarding Bock's long and satisfactory use of this design. In any event, the trial court promptly sustained the objection to the question and instructed the jury to disregard it.

Bock complains by two points that the attorney for Miller was guilty of improper jury argument when he argued that the accident could have been avoided if the

machine had been equipped with a locking device and also in arguing that Bock made no effort to send out warnings about the need for maintenance of the machine. Only the opening argument of the attorney for Miller is in the record, and the record does not show that any objection was made during the argument. There is a hand-written sheet of paper in the transcript which reads as follows:

Bock objects to argument by Rex Houston—request court to instruct jury not to consider—

(1) Safe way was to use a latch on machine.

(2) Bock made no effort to send out warnings to dealers Hammond, Crim or anyone.

(3) Because it is unsworn testimony of attorney Houston—no testimony on the latch.

(4) Court has ruled out Exhibits DB # 18 and # 19. Unsworn testimony of Attorney Rex Houston.

/s/ Earl Sharp
Attorney for Bock

Overruled
/s/ Harold D. Bateman, Judge
5–10–76 10:15 a.m.

■ This instrument was filed on June 18, 1976. Even assuming that it constitutes a valid objection by Bock's attorney to the argument of Miller's attorney, it is apparent that the objections were not made so as to permit any opportunity to "cure" any error. They were all presented to the trial judge at the same time although they have obvious references to different portions of the argument. Any error in this argument could have been cured by prompt objection, and instruction by the trial judge. By failing to timely object, Bock has waived his right to complain of the argument. *Otis Elevator Company v. Wood*, 436 S.W.2d 324 (Tex.1968).

■ Bock also urges that the trial court erred in excluding a copy of a letter purportedly written by Bock to all its dealers in November, 1964, and an insertion in a July, 1965, trade magazine wherein Bock offered to supply stickers to be applied to all extractors with the warning:

FOR YOUR SAFETY
DO NOT FORCE THE LID
DO NOT ATTEMPT TO LOAD OR UN-
LOAD
IF BASKET IS SPINNING

There was no showing that either of these excluded documents was seen by Jenkins or United Furniture and, admittedly, there was not a sticker on the machine in question.

■ Finally, Bock asserts that the issue inquiring whether or not the machine was designed defectively was submitted too broadly. The trial court did not err in submitting the question of whether the Bock laundry machine was designed defectively at the time the machine left the Bock plant to enter the channels of commerce along with the definitions of "Defective Design" and "Unreasonable Risk of Harm." A broad submission such as this is fully authorized under Rule 277, Tex.R.Civ.P.

We have considered all of Bock's cross-points in the light of the record before us. It cannot be said that any error of the trial court complained of by Bock amounted to such a denial of Bock's rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. Accordingly, the cross-points are overruled. Rule 503, Tex.R. Civ.P.

The judgments of the lower courts are reversed and judgment is here rendered in accordance with the jury verdict that George Miller, Sr., as next friend of George Miller, Jr., shall recover of and from Bock Laundry Machine Company the sum of $250,000 for injuries to George Jr., and that George Miller, Sr., individually, shall recover the sum of $1,000 for necessary medical expenses, together with all costs of court and interest as provided by law.

## ON REHEARING

DANIEL, Justice, dissenting.

I would grant the motion for rehearing and reverse and render, because the lower courts were correct in their holdings that Bock Laundry Machine Company was entitled to a directed verdict as a matter of law.

In the alternative, the case should be remanded for a new trial in which the jury would be allowed to know the true non-adversary status of the plaintiffs and the defendant, Luther Jenkins, which status was created by their settlement agreement. Defendant Jenkins (d/b/a Blue Ribbon Cleaners) settled with the plaintiffs for $45,000, but remained in the trial as an ostensible adversary against plaintiffs. Jenkins' testimony and cooperation with plaintiffs were obviously instrumental in the jury's verdict against Bock alone for $250,000 to compensate for the total damages suffered by plaintiffs. Over the objection of Bock, the settlement agreement was kept secret from the jury, which was totally ignorant of the $45,000 payment made by Jenkins to the plaintiffs and the absolute indemnity agreement which plaintiffs had given Jenkins against any further liability to anyone by reason of the accident.[1]

### Bock Entitled to Judgment As a Matter of Law

The uncontroverted evidence establishes that the Bock extractor was designed and manufactured in 1957 in accordance with techniques then common to manufacturers in the same industry, and that the machine worked satisfactorily for eighteen years after shipment to the original purchaser.[2] There was no evidence that the machine was defectively designed or manufactured at the time it left Bock's plant in 1957, or that it was unreasonably dangerous to the purchaser or user at that time. Neither was there evidence of any such dangerous condition at the time the extractor was purchased by Jenkins as a secondhand machine in 1968. Jenkins' testimony was uncontradicted that the machine, including the lid-locking safety device, worked satisfactorily from the day he purchased the machine until the accident on September 1, 1975. It is further undisputed that the lid-locking safety device failed to become engaged on the day of the accident because of deterioration and shrinkage of the rubber mounting pads due to long use, wear, tear and possible contact with a petroleum product during the intervening years.[3] The four rubber mounting pads on the bottom frame of the machine were to prevent vi-

1. The Court has not given further consideration to this point because it was not specified as a grounds for rehearing. Rule 515, Texas Rules of Civil Procedure. Accordingly, I must be content to state that as to future cases, agreements of this nature should not be kept from the jury solely because the settling defendant had no direct financial interest in plaintiff's recovery against a non-settling defendant. It is equally important that the jury know of a plaintiff's receipt of a substantial settlement in exchange for an indemnity agreement which results in plaintiff seeking total recovery against a non-settling defendant. In any event, the financial interest of the settling defendant is not the only feature of the "Mary Carter" type of agreements mentioned in General Motors Corp. v. Simmons, 558 S.W.2d 855, 858 (Tex.1977), as tending to undermine the adversary nature and integrity of the proceedings against the non-settling defendant. As recognized in Simmons, secrecy concerning the agreement is the principal evil to be avoided in such cases, because the "jury as trier of the facts, if apprised of this, would likely weigh differently the *testimony and conduct* of the signing defendant as related to the non-signing defendants." For instance, it is unlikely that the jury verdict in this case would have left the entire blame for total damages to the extent of $250,000 on Bock alone if it had known that Jenkins had already made a substantial settlement with plaintiffs and that plaintiffs and Jenkins did not in fact occupy the adversary role which they played throughout the trial.

2. The machine was shipped from Bock's plant in Toledo, Ohio, to the original Texas purchaser, Leon Crim Furniture Co., on February 6, 1957. Title subsequently passed through intervening users and United Furniture Company to Jenkins (d/b/a Blue Ribbon Cleaning Center) at Henderson, Texas, on July 24, 1968. The machine worked satisfactorily until the time of the accident on September 1, 1975.

3. Plaintiff's expert, Stern, testified that, upon examination after the accident, he found that the rubber mounting pads "had shrunk, they had deteriorated." He said that such shrinkage had rendered the safety device inoperative and that the shrinkage or deterioration was due to: "Two prime things, which one would be age or time, and the other would be that the rubber was attacked by a petroleum product . . ." He said that the deterioration was due also to wear and tear during the long period of time. Jenkins' expert, Dr. Perry, agreed that the rubber pads, especially the one nearest the oil

bration and noise. They had an original thickness of three-eighths of an inch. By September 1, 1975, after 18 years of use and without any known inspection or replacement as recommended in Bock's manual of instructions, one or more had shrunk one-eighth of an inch, thus lowering the superstructure so that the automatic lid-closing safety device did not go into operation.

Strict liability as to Bock depends as a matter of law, not upon whether a defect in the machine existed on the date of the accident in 1975, but whether this machine (and any others of the same design) was unreasonably dangerous at the time it left Bock's plant in 1957. *Henderson v. Ford Motor Co.*, 519 S.W.2d 87 (Tex.1974); Section 402A, Restatement of Torts 2d (1965).

Paraphrasing *Henderson, supra*: The question is whether the Bock extractor, and all extractors of the same design, were unreasonably dangerous from the time of manufacture. Did some feature of the form or material or operation of the extractor threaten harm to persons using the extractor to the extent that any extractor so designed would not be placed in the channels of commerce by a prudent manufacturer aware of the risks involved in its use or to the extent that the extractor would not meet the reasonable expectations of the ordinary user as to its safety? The Bock extractor proved to be a safe machine so long as it was properly maintained.

Section 402A does not make manufacturers liable for subsequent defects caused by normal wear and tear, misuse or failure of normal maintenance by the purchaser. *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974); Comment g., Section 402A, Restatement of Torts 2d (1965). In *Kuisis, supra*, the Supreme Court of Pennsylvania said:

". . . The age of an allegedly defective product must be considered in light of its expected useful life and the stress to which it has been subjected. In most cases, the weighing of these factors should be left to the finder of fact. But in certain situations the prolonged use factor may loom so large as to obscure all others in a case. . . ."

Section 402A, supra, makes it quite clear that the seller or manufacturer is not liable when he delivers the product in a safe condition and subsequent mishandling, neglect, or failure to maintain, renders the product harmful or dangerous. This rule fits the undisputed facts of the present case. Bock warned in its manual of instructions that the rubber pads should be inspected yearly and replaced when necessary. Further, it placed a metal nameplate on the front of its extractor, which notified all subsequent owners as follows: "Read instructions for operation and care of machine before using." A photo of this metal plate, showing the exact size, and a photo of the extractor, are reproduced herewith to show the prominence given to this notice concerning the instructions for operation and care of the machine.

[See following illustration.]

---

spout, had deteriorated and thus allowed the working part of the machine to drop enough to prevent the safety device from operating. He said the deterioration could have resulted from oil or from ozone, or from a combination thereof, plus the heat from the motor over a long period of time.

# BOCK CENTRIFUGAL EXTRACTOR

**BOCK LAUNDRY MACHINE CO.** Toledo, Ohio, U.S.A.

VOLTS 220 CY. 60 PH. 1

MACHINE NO. 24-1.57.74... PAT'D 1483326

NOTE—*Read instructions for operation and care of machine before using*

Photo of plate affixed to the Bock extractor.

Photo of extractor, showing location of
the above metal plate.

When Bock shipped the extractor to the original Texas purchaser in 1956, it had with it a Warranty and Registration Card which read in part: "Bock Extractors are guaranteed to be of the highest quality. They will give many years of satisfactory service *if properly maintained* . . . . It is the user's responsibility to operate this machine *in accordance with the related instructions*." (Emphasis supplied.) The warranty recited that it would be void, "If the 'Bock' nameplate [above] is removed or altered in any way." Also accompanying the machine was a printed sheet entitled "Installation and Operating Instructions" on which it was stated under the heading of Maintenance: "Brake Friction Facing and Rubber Mountings should be inspected at least annually and replaced when necessary." The packet also had a four-page folder entitled "Operating and Maintenance Instructions" which advised: "Inspect, Cor-

rect or Replace as Necessary . . . The Trunion and Bumper Rubbers.—The Rubber Parts should be replaced if there is any free play or if it has lost its liveliness." Another enclosure was a "Parts Price List" which carried under "Parts Most Frequently Required" a set of four "Bumper Rubbers" [heretofore referred to as rubber mountings] for one dollar, with the suggestion that an $8.00 kit containing these and other spare parts be maintained on hand.

The record does not show what happened to these instructions for operation and care of the machine after it was shipped to the original purchaser in 1957. However, Jenkins testified that United had no copy of the instructions to deliver to him when he purchased the machine in 1968, and that he did not write Bock at the address shown on the machine to obtain a copy of such instructions. Jenkins was a trained and experienced mechanic, having done the repair and maintenance work on his own laundry machines for many years. At one time he had owned six different laundries and knew how to maintain the machines. He testified that he realized the importance of obtaining the instructions for operation and maintenance from the manufacturer, and he obtained from United written instructions with reference to another machine purchased from United on the same date. He did not notify Bock of his purchase or location or ask for a set of instructions because he felt like he could operate the machine from his own experience "about as well as he could learn from the instruction book." However, Jenkins admitted that he had never inspected, oiled, or repaired the machine during the seven years that he owned and continuously operated it prior to the accident. He said he knew there was some type of safety device on the machine that prevented the tub from spinning while the lid was open, but he did not know how it worked. Jenkins admitted that in his laundry business he did not conduct inspections and preventive maintenance, but usually ran his equipment until it broke down and then fixed it.

It is clear from Jenkins' undisputed testimony that he neglected and mishandled the machine by failing to obtain an instruction booklet and failing for seven years to inspect the rubber pads which the manufacturer contemplated that the owner would inspect at least annually, with replacement of the rubber parts when they had become worn or deteriorated. As a matter of law, this failure to inspect and maintain the eleven-year old machine for an additional seven years should relieve the manufacturer of any liability for deterioration of rubber pads, the maintenance and replacement of which were contemplated from the beginning to be the responsibility of the purchaser and operator.

The jury found that Jenkins was negligent (a) in operating and maintaining the extractor machine or in permitting it to be operated by the public without proper maintenance and repair; (b) in failing to inspect the machine; (c) in failing to comply with written instructions placed on the nameplate of the machine; and (d) in failing to obtain a manual of instructions. It failed to find, however, that any of such acts of negligence was a proximate cause of the occurrence in question. As heretofore indicated, the record establishes without dispute that the malfunction on September 1, 1975, was caused by the lack of inspection, maintenance, and replacement of the deteriorated rubber mounting pads. This responsibility for maintaining the extractor in the safe condition in which it was sold rested with Jenkins. It was his failure to discharge that duty that resulted in the injury. Such was the holding as a matter of law by the Arizona Supreme Court in a very similar case where a five and one-half year old extractor was involved. *Rogers v. Unimac County, Inc.*, 115 Ariz. 304, 565 P.2d 181 (1977). See also *Westerberg v. School Dist. No. 792, Todd County*, 276 Minn. 1, 148 N.W.2d 312 (1967), a case which involved lack of maintenance of a six-year old extractor. Liability for failure to maintain an 18 year old machine should not be visited upon a manufacturer who was not responsible for the maintenance nor contributed to the lack of it. *Bond v. Transairco Company*, 514 F.2d 642, 645 (5th Cir., 1975). See

also *Kuisis v. Baldwin-Lima-Hamilton Corp., supra*; Comment g. of Sec. 402A, *supra*.

For the reasons stated above, I would affirm the judgments of the lower courts.