**H.E. BUTT GROCERY COMPANY,**
**Appellant,**

v.

**Maria RESENDEZ and Jose**
**Resendez, Appellees.**

No. 13–96–076–CV.

Court of Appeals of Texas,
Corpus Christi.

July 31, 1997.

Rehearing Overruled Oct. 16 1997.

Publication Ordered March 11, 1999.

Crisanta E. Guerra, Roerig, Oliveira & Fisher, Brownsville, Wallace B. Jefferson, Sunny J. Jansma, Crofts, Callaway & Jefferson, San Antonio, for Appellant.

Randall P. Crane, Crane & Cardova, San Benito, for Appellee.

Before Justices DORSEY, CHAVEZ and RODRIGUEZ.

## OPINION

Opinion by Justice DORSEY.

This is a premises liability suit. Maria and Jose Resendez sued HEB after Maria allegedly slipped on a grape and fell in an HEB store. The jury found that HEB's negligence proximately caused her injuries and awarded $150,000 in damages.[1] The trial court reduced the award and entered judgment for $153,785.83 in actual damages and prejudgment interest. HEB appeals by six points of error. We affirm.

The incident occurred on March 7, 1993 at an HEB store in San Benito. At that time, HEB displayed its grapes in bags or boxes in the produce section. The HEB store in this suit also displayed some of its grapes loose (not bagged or boxed) in bowls on a table. Other grapes were displayed on another table. Both tables had railings on them. The store's produce section had a non-skid floor and the store placed floor mats, approximately an inch or an inch and a half thick, near the grape displays. Warning cones were also in the produce section.

Maria Resendez and her husband, Jose Resendez, went grocery shopping at this

---

1. The $150,000 award did not include prejudgment interest.

store about 8:00 p.m. Maria pushed a shopping cart to the produce section and picked up a bag of potatoes. She then went to where the grapes were located. After parking her cart by the grapes, she walked back to the potatoes to get a plastic bag. While getting the bag, her right foot slipped, and she fell near the potatoes. When counsel asked her if she knew what she had slipped and fell on, she said, "I didn't know, but when they helped me get up, then I turned around looking for my shoe. And then that's when I saw that it was the grapes that were there." The grapes were on the floor in front of the potatoes. Prior to her fall, she did not look at the floor in the area where the potatoes were located. However, when she put her cart in front of the grapes, she saw some grapes there.

A couple of HEB employees helped her into a wheelchair. She advised them that she had fallen on grapes and that her left knee was hurting. The employees checked the bottom of her left shoe. She was sure that they did not check her right shoe.

Rene Garcia, Maria's nephew, went to the HEB store to grocery shop about the same time that Maria did. Garcia overheard a conversation between an HEB employee, Roy Lopez, and the store's service manager, Rene Guardiano. When counsel asked Garcia what he had heard Lopez say to Guardiano, Garcia said:

> [H]e was trying to tell the manager that ... she had stepped on, I believe, it was some grapes. And that he had gotten the grapes. You know, they were all ready smashed. And he had, I guess, pushed them underneath a rug that is provided to all ... customers who come in; that he had cleaned up the ... area where she had fallen; that he wanted to avoid another customer from falling.

Garcia testified that Maria had informed him that she had stepped on some grapes.

Jose Resendez, Maria's husband, entered the HEB store soon after Maria had fallen. He asked her what had happened, and she advised him she had fallen down " '[w]here the grapes were.' " He overheard Lopez inform Guardiano that " '[w]e just swept them underneath the mat. We swept them underneath the mats.' "

Jorge Luis Vela was the manager at the HEB where Maria fell. His testimony showed that all of the employees were responsible for cleaning or washing the floors at the HEB. The employees were trained at the initial store orientation and throughout their employment. The employees were trained to "wash floors for safety" and if a hazard existed, they were trained to immediately take care of it. If a spill occurred, an employee could use a paper towel to clean it up. However, if a spill was too large for a paper towel, an employee would "flag somebody down" to get a mop. At the time Maria fell, this HEB had a maintenance department. During the 1:00 p.m. to 10:00 p.m. shift (the time period during which Maria fell), the maintenance department had the primary responsibility to maintain the floors with dry mopping or with a push broom. When the store closed, employees used a Clark scrubber, a mop, or both to completely wet down the floor. Afterwards, the floor was dried and buffed, and a push broom was used to shine it. During the day shift, the floor was swept all day long. Vela said that a person could possibly run a broom through the entire floor every half hour or hour.

Rene Guardiano, the HEB service manager, investigated Maria's fall. He inspected the general area of the floor where Maria fell. He found nothing on the floor. He checked both of her shoes and saw nothing on the bottom of them. He was not able to determine what caused Maria to fall. He was in charge of the maintenance schedule. In March 1993, the store stayed open from 6:00 a.m. to midnight. A maintenance employee worked from midnight to 8:00 a.m. His responsibilities were to fully sweep, mop, do some waxing on the floors, and clean the bathrooms. When the midnight to 8:00 a.m. shift ended, the store assigned courtesy clerks or sackers to sweep and spot mop the floors. From 6:00 a.m. to 10:00 p.m., the whole store was swept once every 30 to 45 minutes. When counsel asked him if his investigation had revealed the last time someone had swept the floor, he responded, "I got information from the produce guy,

Johnny, that he had just seen the floor care guy just go by there. I can't recall whether it was 10, 15 minutes before." He said that the grapes were packaged in clear, little bags. The bags had little tears or air pockets in them to prevent spoilage. He said that some customers tore the bags and removed the grapes that they wanted. He had also seen customers tear the bags in order to taste the grapes. He did not remember Rene Garcia overhearing a conversation. Prior to Maria's fall, Guardiano had no knowledge of anyone falling on grapes in that store.

Johnny Muniz was a produce employee on duty when Maria fell. Part of his responsibility was to clean the floor in the produce section. He said that sometimes people ate the grapes that were on display and dropped one or two of them. If he saw the grapes fall, he picked them up right away. In his experience, if a grape fell, it stayed on the mat. He agreed that grapes on the floor caused a danger. He said that "[A]nything that is on the table and if it falls, it could be dangerous, if it is not picked up." He arrived on the scene soon after Maria had fallen. He found her in the middle of the floor. Not more than one-half hour after Muniz found her, he and Roy Lopez checked the area. They did not find anything. Muniz said that after he and Roy had checked the area, there was a grape next to the pallet, and "the grape was just stepped on." Muniz and Guardiano checked Maria's shoes and found no evidence of stains, smears, or moisture. Muniz saw someone sweeping the floor no more than ten minutes before Maria fell. Prior to the incident, he had no knowledge of any customers slipping and falling on a grape. He saw no grapes on the floor before the incident occurred.

Roy Lopez worked as a greeter for the HEB store where Maria fell. He arrived on the scene soon after she fell and found her between the potatoes and the apples. When counsel asked him if she told him what she had slipped on, he said, "She told me it was a grape." He did not see any grapes on the floor after Maria had slipped. However, he checked a second time and found a crushed grape between two pallets. This was not in the area where customers walked. He checked the sole of one of her shoes and found nothing on it. Prior to this incident, he knew of no one who had slipped and fell on a grape. Lopez denied sweeping grapes under the mat on the night that Maria fell.

## Analysis

■ By point one, HEB asserts the trial court erred in denying its motion for judgment notwithstanding the verdict because the evidence is legally insufficient to support the jury's finding that its negligence proximately caused Maria's damages. By point two, HEB asserts the court erred in denying its motion for judgment notwithstanding the verdict because the evidence is legally insufficient to support the finding that it did not use ordinary care to reduce or eliminate an unreasonable risk of harm created by a condition on its premises which it knew or reasonably should have known existed.

Special Question 1 asked the jury, "Did the negligence, if any, of those named below proximately cause the occurrence or injury in question?" The jury answered "Yes" for HEB.

■ When reviewing a judgment notwithstanding the verdict, an appellate court evaluates the evidence in the light most favorable to the jury's findings, considering only the evidence and inferences which support those findings and disregarding evidence and inferences contrary to those findings. *Johnson & Johnson Medical, Inc. v. Sanchez*, 924 S.W.2d 925, 929 (Tex.1996); *Miller v. Bock Laundry Mach. Co.*, 568 S.W.2d 648, 650 (Tex.1977).

■ In *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex.1983) the supreme court stated the elements of a premises liability cause of action. The elements are: (1) actual or constructive knowledge of some condition on the premises by the owner/operator; (2) that the condition posed an unreasonable risk of harm; (3) that the owner/operator did not exercise reasonable care to reduce or eliminate the risk; and (4) that the owner/operator's failure to use such care proximately caused the plaintiff's injuries. *Corbin*, 648

S.W.2d at 296; *see Keetch v. Kroger Co.,* 845 S.W.2d 262, 264 (Tex.1992).

In this case, there were two displays of grapes: one of loose grapes in bowls, as well as the bagged grapes in bins with the other produce. The evidence was that HEB knew that customers were taking loose grapes from the bowls and some were dropped on the floor. Some customers would open the bags and remove grapes. HEB knew that grapes on the floor were a danger to its customers, because they could step on a grape and fall. The loose grape display could well be considered an invitation to remove individual grapes from the bowls, and as such included an inherent risk that some of the loose grapes removed would fall on the floor. Grapes on the floor in the customer area are unreasonably dangerous. The combination of factors that contributed to grapes being on the floor causing Mrs. Resendez's fall could well constitute an unreasonably dangerous condition. We hold that there is legally sufficient evidence to support the judgment. The court did not err by refusing to grant HEB's motion for judgment notwithstanding the verdict. We overrule points one and two.

By point three, HEB asserts that, alternatively, this court should order a new trial because the evidence is factually insufficient to support the finding that its negligence proximately caused Maria's damages. In reviewing a factual sufficiency point, a court of appeals must weigh all of the evidence in the record. *Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex.1980). An appellate court may overturn findings only if they are so against the great weight and preponderance of the evidence that they are clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Under the supreme court's holding in *Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986), a court of appeals must also "clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust." *Pool,* 715 S.W.2d at 635.

In this case, HEB introduced a considerable amount of evidence concerning how it kept this particular store clean and safe. This evidence included the training of employees to clean the store and watch for safety hazards, the fact that the floor was swept every 30 to 45 minutes while open for business, the maintenance of the floor when the store was closed, the non-skid floor in the produce section, the mats, and the warning cones. On the other hand, the plaintiff introduced evidence that the HEB store displayed some of its grapes loose in bowls. People ate the grapes and dropped them to the floor, creating a dangerous condition for other shoppers. Maria was in the produce section when she slipped and fell on a grape. The evidence showed that grapes were in the area where she fell. This fall caused injuries to her body. After considering all the evidence, we hold that the jury's answer to Special Question 1 was not so against the great weight and preponderance of the evidence that it was manifestly unjust. We overrule point three.

By point four, HEB requests this Court to reverse the judgment and remand the case for a new trial because the trial court erred when it excluded evidence of Maria's prior surgeries to her right and left knees. During a motion in limine, the trial court had ruled that HEB could not introduce testimony concerning two knee surgeries that Maria had prior to her fall. During trial, HEB argued to the court that the evidence would show her condition at the time of the fall, her ability to work, her current lifestyle, and her pain and suffering after her fall. In support of a bill of exceptions, HEB offered Dr. Vargas' medical records. (Dr. Vargas had performed surgery on Maria's knee prior to the fall.) It also offered Maria's deposition testimony, dated June 29, 1995, in which she testified about her knee surgeries.

To obtain reversal of a judgment based upon error of the trial court in admission or exclusion of evidence, the complainant must show the following: (1) that the trial court did in fact commit error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989); *Bridges v. City of Richardson,* 163 Tex. 292, 354 S.W.2d 366, 368 (1962). *See* Tex.R.App. P. 81(b). The admission of evidence is a

matter within the trial court's discretion. *Jones v. Jones,* 890 S.W.2d 471, 474 (Tex. App.—Corpus Christi 1994, writ denied). An abuse of discretion occurs when a court acts without reference to guiding rules or principles, or acts arbitrarily or unreasonably. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex.1985).

The evidence admitted at trial showed that prior to the time that Maria fell in the HEB store, she received operations to both of her knees. The evidence also showed she recovered from these surgeries prior to her fall. HEB argues that because the trial court excluded Maria's medical records and deposition, it could not rebut the evidence of damages that she presented at trial.

That Mrs. Resendez had undergone surgery to replace both her knees was undisputed. However, HEB sought to admit her bare medical records without any interpretation or evidence that she had not fully recovered from the surgeries. If the trial court had admitted them into evidence, the jury could have only speculated about Maria's medical progress. HEB was not prevented from rebutting the extent of her recovery from her prior surgeries. We hold the trial court did not abuse its discretion by excluding evidence of surgeries to Maria's knees. We overrule point four.

By point five, HEB asserts we should reverse the judgment and remand the case for a new trial, because the evidence is factually insufficient to support the jury's damage findings. Special Question 3 asked the jury to find from a preponderance of the evidence what sum of money, if any, if paid now in cash, would fairly and reasonably compensate Maria, individually for her injuries, if any, resulting from the occurrence in question. The jury awarded $30,000 for each of these elements of damage: physical pain and mental anguish in the past, future pain and mental anguish, loss of physical ability in the past and in the future, and reasonable expense for health-care services in the past for a total of $150,000. HEB filed a motion for new trial, arguing in part, that the evidence did not supported the $30,000 award for past medical expenses. The trial court agreed and signed a modified judgment, reducing the award for past medical expense to $14,286.68.

The proper standard of review for excessive damages is factual sufficiency of the evidence. *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 847–48 (Tex.1990); *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986). The mental process by which a fact finder determines the amount of damages is ordinarily not cognizable by an appellate court. *Hyundai Motor Co. v. Chandler,* 882 S.W.2d 606, 615 (Tex.App.—Corpus Christi 1994, writ denied); *Terry v. Garcia,* 800 S.W.2d 854, 859 (Tex.App.—San Antonio 1990, writ denied). The measure of damages in a personal injury case is not capable of measurement by a specific standard, and, therefore, these types of damages are uniquely within the province of the trier of fact. *Southwestern Bell Tel. Co. v. Wilson* 768 S.W.2d 755, 763 (Tex. App.—Corpus Christi 1988, writ denied). *See Tidelands Automobile Club v. Walters,* 699 S.W.2d 939, 945 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.).

The court may not substitute its judgment for that of the fact finder. *Larson v. Cactus Utility Co.,* 730 S.W.2d 640, 641 (Tex.1987); *Wilson,* 768 S.W.2d at 763. A reviewing court must measure each case on its own facts, and considerable discretion and latitude is vested in the fact finder. *Chandler,* 882 S.W.2d at 615; *Mills v. Jackson,* 711 S.W.2d 427, 434 (Tex.App.—Fort Worth 1986, no writ); *Rosenblum v. Bloom,* 492 S.W.2d 321, 325 (Tex.Civ.App.—Waco 1973, writ ref'd n.r.e.). The law requires only the kind of proof of which the fact to be proved is susceptible. *Tri–State Motor Transit Co. v. Nicar,* 765 S.W.2d 486, 491 (Tex.App.—Houston [14 th Dist.] 1989, no writ). The fact finder's province is to resolve the speculative matters of pain and suffering, future pain and suffering, future disfigurement, mental anguish, and future physical impairment and set the amount of damages attributable to these damage components. *Chandler,* 882 S.W.2d at 615; *Duron v. Merritt,* 846 S.W.2d 23, 26 (Tex.App.—Corpus Christi 1992, no writ); *Pipgras v. Hart,* 832 S.W.2d 360, 366 (Tex.App.—Fort Worth 1992, writ denied) (future physical pain and mental anguish are

speculative and within jury's province to resolve).

The evidence in this case is that Mrs. Resendez had knee-replacement surgeries performed on each of her knees, prior to her fall at the HEB. After she fell at the HEB, she had surgery on her left knee. She was an elderly housewife who was not employed outside the home. When she fell, she injured her left knee, right shoulder, head, at least one finger, and her hip. After a brief hospital stay, she returned home and in April 1994, she had surgery on her left knee. After the surgery, the knee continued to hurt during rainy times but felt better during periods of sunshine. She had pain medication for the knee; however, she said that the medicine was too strong. At the time of trial, her head still hurt, and she had to take aspirins for the pain. Her shoulder and finger continued to hurt as well. Her hip would hurt during rainy weather. When asked about her left knee, she said, "[I]t's bad right now."

Maria's husband, Jose, testified that after she had her first left-knee surgery in 1991, she was doing fine. She could work by herself with no assistance, she could do all the housework, she could walk and go to dances, and travel. He said that after her fall, she was having a lot of pain in her knee. When she came home from the hospital, she still had pain in her knee, shoulder, and finger. According to Jose, her finger was broken. He had to help her to the bathroom, and she had to use a cane. She could do some cooking, but they had to hire someone to cook and clean. She could not leave the house on her own, but Jose would have to help her. After the 1994 surgery, she could walk, but she could not kneel down or stand very long. During two months prior to his testimony, Maria complained of her leg hurting every time the weather changed.

Maria's nephew, Rene Garcia, said that after Maria had her first surgery on her left knee, she was able to move around, and she used a walker. As she improved, she only used a cane. Before she fell, she was able to walk without a cane. She could drive, go out, and visit her daughter. He indicated that after her fall, she was not as active as she was prior to the fall. She could not do things around the house like she could before the fall.

Maria's son, Robert, testified that after his mother had the 1991 surgery on her knee, she was able to walk, get around, and dance. She could do whatever she needed to do. He was not aware that she needed a cane. However, since her fall, he noticed a big difference in her. She could not take anymore leisure walks to church without assistance. Church was three blocks from where she lived. He said that she could not do much on her own without the assistance of a cane. She needed assistance to maintain the household. He stated that his dad had "converted more like being a mom to my mom", but admitted not to know his parents' daily lifestyles.

Maria's daughter-in-law, Maria Victoria Resendez, lived in Conroe when Maria had the 1991 surgery to her left knee. After that surgery, Maria Victoria visited her approximately once a month. Maria was very active and able to perform her household chores. In July 1993 (about four months after Maria's fall), Maria Victoria moved closer to Maria's residence. She now sees Maria every other day and every weekend. Maria Victoria said that since the fall Maria "can't do much anymore." She gets tired, and her legs start to hurt. She was also in a lot of pain. She could not stand up too long. She could do some house cleaning, but she needed someone to cook for her. The fall also limited her shopping activities. Maria Victoria was not aware that Maria had problems with her right knee. She said that Maria's husband did take Maria to bingo.

Plaintiff's Exhibit 17 shows that Maria's medical bills totaled $14,286.68.

After considering all the evidence, we hold that the damage award is not so against the great weight and preponderance of the evidence that it is manifestly unjust. We overrule point five.

By point six, HEB asserts that we should reverse the judgment and remand the case for a new trial, because the jury's brief period of deliberation and the uniformity of its unanimous damage awards show that the

jury did not separately consider each element of damages. HEB's complaint is that because the jury inserted $30,000 for each element of damages, it did not distinguish past damages from future damages, mental anguish from loss of physical ability, and amounts subject to exacting mathematical scrutiny from amounts calling for subjective deliberation. The result was a "rubber-stamp verdict" devoid of any reasoned assessment of the evidence.

The damages in this case were principally for past and future physical pain and mental anguish, and past and future loss of physical ability. The assessment of damages for these unmeasurable pains and losses is ethereal and cannot be appraised by measuring against objective criteria. Because the injury and loss are real they are to be compensated for, although the evaluation requires placing a worth to qualities for which there is no marketplace to determine price. For this the jury is uniquely suited, because the jury's province is to consider the evidence and award damages based upon that evidence. We cannot say that because the jury chose the same sum for each of the intangible elements of damage that it was motivated by prejudice or subject to improper influence.

The damage element concerning reasonable expenses for past health-care services was subject to a mathematical figure. The trial court did reduce that figure. HEB does not direct us to any evidence showing that the jury awarded damages based upon prejudice, or that it failed to follow instructions. We overrule point six.

We AFFIRM the trial court's judgment.