**HYUNDAI MOTOR COMPANY, Hyundai Motor America, and Leland Hyundai, Inc., Appellants,**

**v.**

**Chloe J. CHANDLER, Individually and as an Heir of the Estate of Pele Anne Chandler, Jesse Srader, and Shannon Modrell, Appellees.**

No. 13–92–145–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 25, 1994.

Rehearing Overruled Nov. 3, 1994.

608

Charles B. Kirklin, David Scott Curcio, Tim S. Leonard, Kirklin, Boudreaux & Leonard, Vance Christopher, Kathleen Hopkins Alsina, Joseph Y. Ahmad, Crain, Caton & James, Steven Ellinger, Stauffacher Associates, Inc., Houston, TX, for appellants.

Mike O'Brien, Robert L. Collins, Terrill L. Flenniken, J. Preston Wrotenbery, Hirsch, Glover, Robinson & Sheiness, Houston, for appellees.

Before DORSEY, FEDERICO G. HINOJOSA, Jr. and YAÑEZ, JJ.

## OPINION

FEDERICO G. HINOJOSA, Jr., Justice.

This is an appeal from a products liability suit involving a 1986 Hyundai Excel automobile. The suit arose when the Excel left the road and hit a tree, killing Pele Chandler (the left rear seat passenger) and injuring Shannon Modrell (the driver), Jesse Srader, (the front seat passenger), and Susan Englishbee (the right rear seat passenger).

In August 1987, 19–year–old Pele Chandler attended her friend, Shannon Modrell's 18th birthday party. Shannon's parents and Shannon's friends, Jesse Srader and Susan Englishbee, also attended the party. The party was held at a Steak and Ale Restaurant located near the intersection of I–45 and FM 1960 in Harris County. The party ended late in the evening and Shannon's father, Garry Modrell, let Shannon drive away from the restaurant in his 1986 Hyundai Excel. Shannon only had a learner's permit to drive so Srader sat in the front seat and acted as her licensed, supervising driver. Englishbee sat in the right rear seat and Pele sat in the left rear seat. Shannon drove the Excel out of the restaurant parking lot and turned onto the I–45 feeder road. While on the feeder road, the Excel went out of control, left the road, and collided head on with a tree. All four people were taken to a hospital. Pele was treated in the emergency room and rushed to surgery. She died on the operating table. Shannon, Srader, and Englishbee were only injured.

Chloe Chandler (Pele's mother), Srader, and Shannon sued Hyundai Motor America, Hyundai Motor Company, and Leland Hyundai, Inc. (collectively "Hyundai"), alleging breach of warranty, negligence, and strict liability in its design of the Excel. Chandler also sued Srader and Shannon for negligence and Srader sued Shannon for negligence. The case was tried to a jury and it returned a verdict favorable to appellees. The jury, however, found Shannon 35% negligent. The trial court entered judgment that Chandler recover $661,876.10 from Hyundai and Shannon, that Srader recover $163,951.44 from Hyundai, and that Shannon recover $22,423.98 from Hyundai.

Appellants, Hyundai, appeal by eighteen points of error. Shannon raises six cross-points of error. We reverse the judgment of the trial court and remand the case for a new trial.

By points of error ten through sixteen, appellants attack the factual and legal sufficiency of the evidence to support certain jury findings and the damage awards to appellees.

When a party without the burden of proof complains on appeal of a jury finding, the appropriate points of error are that there is "no evidence" or "insufficient evidence" to support the jury finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983).

When we review a "no evidence" or legal sufficiency of the evidence point, we consider only the evidence and reasonable inferences that tend to support the jury's finding, and we disregard all evidence and inferences to the contrary. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). We overrule the point and uphold the finding if we find any evidence to support the finding. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989).

When we review an "insufficient evidence" or factual sufficiency of the evidence point, we consider, weigh and examine all of the evidence which supports or undermines the jury's finding. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside the verdict only when we find that the evidence standing alone is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

When a party with the burden of proof complains on appeal from an adverse jury finding, the appropriate points of error are "that the matter was established as a matter of law" or "that the jury's finding was against the great weight and preponderance of the evidence." *Croucher*, 660 S.W.2d at 58.

When we review a legal sufficiency or "that the matter was established as a matter of law" point, we examine the record for

evidence supporting the finding of fact and ignore all evidence to the contrary. *Sterner v. Marathon,* 767 S.W.2d 686, 690 (Tex.1989); *Hickey v. Couchman,* 797 S.W.2d 103, 109 (Tex.App.—Corpus Christi 1990, writ denied). If we find that no evidence supports the finding, we must determine from the record whether the contrary proposition is established as a matter of law. *Sterner,* 767 S.W.2d at 690; *Hickey,* 797 S.W.2d at 109.

When we review a factual sufficiency or "that the jury's finding was against the great weight and preponderance of the evidence" point, we examine the entire record. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Hickey,* 797 S.W.2d at 110. We set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain,* 709 S.W.2d at 176; *Hickey,* 797 S.W.2d at 110.

By their tenth point of error, appellants attack the legal and factual sufficiency of the evidence to show that a design defect caused the occurrence.

Chloe Chandler alleged: 1) that the Excel was defective in that it was designed with only a lap belt seat restraint mechanism for back seat passengers, 2) that this mechanism was designed to fasten about the soft tissue portions of the abdomen, as opposed to fastening about the body's pelvic bone region, 3) that at the time of the collision, Pele was wearing the lap belt, 4) that the impact threw her forward, and 5) that the seat belt, which was fastened about her abdomen, broke through her abdominal wall, causing fatal injuries. In the alternative, she alleged that the Excel's defective design caused it to suddenly and without warning, veer off the road and crash, and that this was the producing cause of Pele's death.

Shannon alleged that the Excel had design defects in its steering system, braking system, front drive shaft, and drive system which caused her to lose control of the vehicle. Srader alleged that the Excel had a defect in the right front wheel assembly, causing Shannon to lose control of the car.

Special Question 1 asked the jury:

Was there a manufacturing defect and/or design defect and/or a defect in the marketing of the 1986 Hyundai Excel in question at the time it left the possession of Hyundai that was a producing cause of the occurrence in question?

The jury answered affirmatively to a design defect. We will analyze the evidence to determine whether a design defect caused the Excel to leave the road and whether a design defect in the car's left rear restraint system caused Pele's death.

To recover under a theory of strict liability, a plaintiff must prove the defective and unreasonably dangerous condition of the defendant's product and a causal connection between the condition and the plaintiff's injuries or damages. *Lucas v. Texas Indus., Inc.,* 696 S.W.2d 372, 377 (Tex.1984); *Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374, 376 (Tex.1978). A plaintiff may prove a product defective if it is unreasonably dangerous in construction, or if it is unreasonably dangerous as designed, or if it is unreasonably dangerous because adequate warnings or instructions were not provided. *Lucas,* 696 S.W.2d at 377; *Miller v. Bock Laundry Mach. Co.,* 568 S.W.2d 648, 650 (Tex. 1977).

The Supreme Court has established a test for determining design defect. *Turner v. General Motors Corp.,* 584 S.W.2d 844, 847 (Tex.1979). The test requires balancing the product's utility against the risks involved in its use in order to find that the design is unreasonably dangerous. *Id.* The Supreme Court has stated:

The jury may consider many factors before deciding whether a product's usefulness or desirability are out-weighed by its risks. Their finding on defectiveness may be influenced by evidence of a safer design that would have prevented the injury. [citations omitted.] Because defectiveness of the product in question is determined in relation to safer alternatives, the fact that its risks could be diminished easily or cheaply may greatly influence the outcome of the case....

This feasibility is a relative, not an absolute, concept; the more scientifically and economically feasible the alternative was,

the more likely that a jury may find that the product was defectively designed. A plaintiff may advance the argument that a safer alternative was feasible with evidence that it was in actual use or was available at the time of manufacture. Feasibility may also be shown with evidence of the scientific and economic capacity to develop the safer alternative....

*Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 746 (Tex.1980). *See Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 62 (Tex. 1983).

### Evidence of a Design Defect Leading to Shannon's Loss of Control of the Excel

 Roger Owens, an engineer, testified that he inspected and evaluated the Excel to see if it had a defect in its steering or front end. He looked at the steering and drive-train assembly, some reports and test data performed by independent contractors at Hyundai's request, and consumer complaints that, according to Owens, addressed the severe vibration in the Excel's front end. When Owens was asked if he found anything to show that a defect contributed to the cause of the collision, he responded that he found a crack in the cage assembly of the right-hand double offset joint (DOJ), the right-hand drive system for the Excel's front end. Owens concluded that an extremely violent vibrational body shake, which is inherent in the Excel at a certain resonant frequency that corresponded to normal highway speed, caused the Excel to leave the road and hit the tree. According to Owens, the Excel's violent vibrational body shake caused erratic steering behavior and loss of steering control. Owens testified that the binding (restriction) in the DOJ assembly drove the engine into a frequency of vibrations that was in resonance with other vibrations in the vehicle. This caused extremely violent events to occur.

Owens also testified that the structural vibration is inherent due to the lightweight structure of the Excel, particularly the forward chassis. In other words, the structural vibration is inherent because the Excel does not have a lot of steel. The less stiff the car, the more susceptible it is to vibrational movement. According to Owens, GKN Technologies and Goodyear performed tests, at Hyundai's request, that pinpointed the frequencies of vibration in the chassis, the lower control arm assembly, and the engine assembly.[1] GKN recommended that Hyundai stiffen the body assemblies and lower control arms and change the DOJ assembly to prevent the engine from resonating with the vehicle. GKN concluded that on rare occasions, the vehicle could have "extremely violent events."

When Owens was asked to give an opinion whether the design of the components and systems that went into resonance and caused the loss of steering control showed that the system and the vehicle were defectively designed, he responded, "It's defectively designed if you intend to drive over 40 miles an hour." Owens was then asked if he regarded the Excel unreasonably dangerous if all the factors and variables came into resonance, and he responded, "At Highway [sic] speeds it is, yes."

Gregg Sifferman, an eyewitness to the collision, testified that he was driving north on the I–45 feeder road when the Excel passed him. It swerved from side to side at 45 or 50 mph and left the road.

Srader testified that while Shannon had the steering wheel in her hands, the wheel went back and forth. The car rocked like a boat, started fish-tailing, and pulled to the right. It veered off the road, pulled to the right again, and went through the ditch. At that point, the car was out of control. Shannon threw up her hands and yelled at him to grab the wheel. He grabbed it with his left hand and tried to "push" the car towards the road. However, the car did not respond and hit the tree. Srader testified that Shannon was not playing with the steering wheel. His testimony showed that nothing he did caused the car to go out of control and that he could have done nothing to prevent the collision.

Shannon testified that while on the feeder road, the Excel went out of control and she

---

**1.** These tests were not performed on the Excel involved in this collision.

panicked. She denied that she was playing with the steering wheel.

Appellants claim that no defect existed and that the evidence shows that Shannon and Srader caused the collision. They point out that Shannon was an unskilled driver because she only had a learner's permit to drive. They assert that prior to the collision, Srader had teased her, and that she reacted by violently and voluntarily jerking the steering wheel from side to side. Appellants point to Srader's testimony showing that while on the feeder road, he asked Shannon to get on the freeway, but she refused. He stated that Shannon could have thought he was teasing her when he said, "[Y]ou are a pretty new driver and you probably shouldn't get on the freeway." Srader testified that based on what he knew and saw at the time of the incident, he believed that she had jerked the steering wheel.

Susan Englishbee, the right rear seat passenger, testified that she saw Shannon's arms jerking the steering wheel back and forth.

The evidence shows that the Excel was defectively designed if driven over 40 mph, and that it was exceeding that speed when it swerved and left the road. The jury could have inferred that a safer, alternative design existed based upon GKN's recommendations, or Owens' testimony that the vibration was due to the Excel's lightweight structure and that it did not have a lot of steel. After reviewing all of the evidence, we hold that the evidence is legally and factually sufficient to support the jury's finding that a design defect caused the collision.

### Evidence of a Design Defect in the Excel's Left Rear Restraint System

Roger Owens examined the seat belts and the floor pan underneath the rear seat in the Excel involved in this collision. Owens testified that the rear seat pan was flat with a heavy sloping curvature towards the rear. The seat was made almost entirely of foam rubber with virtually no metal supports. Owens concluded that this would cause a rear seat passenger to "submarine" if he was in-

volved in a front end collision while wearing a seat belt.

Dr. Channing Ewing, a physician with experience on the effects of restraint and motion on the human body, testified that as a result of the collision, Pele was subjected to a forward acceleration. Her lap belt failed to be restrained on her pelvis. It came over the rim of her pelvis and almost cut her in half. It was Dr. Ewing's opinion that the system's failure to stay on Pele's pelvis caused her injuries. According to Dr. Ewing, the restraint system found in the right and left rear seats of the 1986 Excel was unreasonably dangerous.

Dr. Alvin Hyde, a physician who has done research on the acceleration and deceleration of the human body in restraints, testified that the actual seat belt webbing, retractor, and locking mechanism of the restraint system used in the left rear seat of the Excel involved in this collision looked good, but it could still kill or injure an occupant because the rest of the design was wrong. Dr. Hyde testified that the seat was too flat and thin. It was Dr. Hyde's opinion that Pele's body submarined beneath the seat belt and jackknifed. It was also Dr. Hyde's opinion that the lap belt restraint in the Excel did not work as it should have.

Dr. Clifford Kitten, the surgeon who operated on Pele after the collision, testified that Pele had a large, belt-like bruise across her entire lower abdomen at the umbilicus (navel) level. The bruise was a seat belt injury. Pele had injuries to her abdominal muscles, supporting tissues, intestines, and vascular structures. It was Dr. Kitten's opinion that a seat belt caused the injuries leading to Pele's death. According to Dr. Kitten, the seat belt did not stay on Pele's pelvis, thus causing the traumatic injuries immediately above the top of her pelvis.

■ The evidence shows: 1) that the rear seat pan was flat with a heavy sloping curvature towards the rear, 2) that the rear seat was made almost entirely of foam rubber with virtually no metal supports, 3) that this would cause a rear seat passenger to submarine if she was involved in a frontal collision while wearing a seat belt, 4) that the restraint system found in the left rear seat was

unreasonably dangerous, 5) that the seat belt did not stay on Pele's pelvis, 7) that Pele had a large, belt-like bruise across her entire lower abdomen at the umbilicus (navel) level, 8) that the bruise was a seat belt injury, 9) that Pele had injuries to her abdominal muscles, supporting tissues, intestines, and vascular structures, 9) that the traumatic injuries were immediately above the top of her pelvis, and 10) that the seat belt caused the injuries leading to her death. After reviewing all of the evidence, we hold that the evidence is legally and factually sufficient to show that a design defect in the Excel's left rear restraint system caused Pele's death. Appellant's tenth point of error is overruled.

By their eleventh point of error, appellants attack the legal and factual sufficiency of the evidence to support the jury's answer to Special Question 2 that an unmerchantable product caused the occurrence.

■■■ Proof of a defect is required in an action for breach of implied warranty of merchantability under TEX.BUS. & COM.CODE ANN. § 2.314(b)(3) (Vernon 1968).[2] *Plas–Tex, Inc.,* 772 S.W.2d at 444. A plaintiff in an implied warranty of merchantability case has the burden of proving 1) that the goods were defective at the time they left the manufacturer's or seller's possession, and 2) that the goods were unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy; *i.e.,* because of a defect.[3] *Id.* A plaintiff does not have to use direct or expert-opinion evidence to show that the goods had a defect; he can meet this burden by using circumstantial evidence. *Id.* Evidence of proper use of the goods together with a malfunction may be sufficient evidence of a defect. *Id.* at 444–45.

■■■ The evidence reflects that a design defect caused the Excel to leave the road and hit the tree. Due to the impact, a separate design defect in the left rear restraint system

caused Pele's death. Both defects existed at the time the Excel left Hyundai's possession. We hold that the evidence is legally and factually sufficient to support the jury's finding that the Excel was unfit for the ordinary purposes for which it was used and that this unfit condition caused the occurrence. Appellants' eleventh point of error is overruled.

By their twelfth point of error, appellants attack the legal and factual sufficiency of the evidence to support the jury's finding that their negligence proximately caused damages to Pele Chandler.

Special Question 3 asked the jury:

Was the negligence, if any, of any of the parties listed below a proximate cause of damages to Pele Chandler and/or Shannon Modrell and/or Jesse Srader?

The jury found that Shannon's negligence proximately caused damages to herself, Pele, and Srader. It also found that Hyundai's negligence proximately caused damages to Pele.

■■■ The care taken by the supplier of a product in its preparation, manufacture, or sale, is not a consideration in strict liability; it is, however, the ultimate inquiry in a negligence action. *Gonzales v. Caterpillar Tractor Co.,* 571 S.W.2d 867, 871 (Tex.1978). Strict liability looks at the product and determines if it is defective. *Id.* Negligence looks at the acts of the manufacturer and determines if it exercised ordinary care in design and production. *Id.*

The standard of care required of a manufacturer in the design of products is expressly set out in §§ 395 and 398 of the Restatement (Second) of Torts (1965), which the Supreme Court quoted with approval in *Gonzales.* Section 395 states:

A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should

---

**2.** TEX.BUS. & COM.CODE ANN. § 2.314(b)(3) provides in relevant part as follows: "(b) Goods to be merchantable must be at least such as ... (3) are fit for the ordinary purposes for which such goods are used...."

**3.** In *Plas–Tex, Inc.,* the Supreme Court made clear that a defect in an implied warranty of merchantability case is not the same as a defect

in a strict products liability case. In the former, the word "defect" means a condition of the goods that renders them unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy. In the latter, the word "defect" means a condition of the product that renders it unreasonably dangerous.

recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.

Section 398, a special application of the rule in Section 395, is entitled, "Chattel Made Under Dangerous Plan or Design" and states:

A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.

█ In the instant case, the issue is whether the evidence supports the jury's conclusion that Hyundai negligently designed the Excel in question. *See Gonzales,* 571 S.W.2d at 872.

Ikhwan Kim testified that he was the Hyundai employee who decided what restraints were installed in the U.S. version of the 1986 Excel. He designed the seat belt safety restraint systems for all 1986 Excels sold world-wide. He knew that the U.S. required Hyundai to install automobile lap belts that would stay on a person's pelvis under all conditions, including a collision. He was aware of the dangers of a lap belt riding over a person's pelvis and breaking through the soft tissues of the abdomen. He did not perform any crash tests to determine if the lap-only belt would stay on a person's pelvis in the event of a collision. Hyundai Motor Company never performed any crash tests on the rear seat belt systems of the 1986 Excel.

Drs. Ewing and Kitten testified that the lap belt did not stay on Pele's pelvis during the collision and that the lap belt caused the injuries leading to her death. After considering all of the evidence, we hold that the evidence is legally and factually sufficient to support the jury's finding that Hyundai's negligence proximately caused damages to Pele Chandler. Appellants' twelfth point of error is overruled.

By their thirteenth point of error, appellants attack the legal and factual sufficiency of the evidence to support the jury's answer to Special Question 3 that Srader was not negligent.

Shannon testified that nothing Srader did caused the collision. Srader testified that after the car went off the road and through the ditch, he grabbed the steering wheel with his left hand and tried to "push" the car back towards the road. He denied that any horse play occurred in the car and denied that he was on drugs the day of the collision or that he had anything to drink that day.

Negligence requires the presence of the following elements: 1) duty on the part of one person to another, 2) breach of that legal duty, and 3) injury to the person to whom the duty is owed as a proximate result of the breach. *City of Gladewater v. Pike,* 727 S.W.2d 514, 517 (Tex.1987). After reviewing all of the evidence, we hold that the evidence is legally and factually sufficient to support the jury's finding of no negligence on Srader's behalf. Appellants' thirteenth point of error is overruled.

█ By their fourteenth and fifteenth points of error, appellants attack the legal and factual sufficiency of the evidence to support the jury's answer to Special Question 4 that Hyundai was 65% responsible and that Shannon was 35% responsible for the occurrence.

The evidence shows that Shannon was negligent in causing the collision. After turning onto the feeder road, Shannon remembered "driving down the road and panicking, the car being out of control." Srader testified that after the car went through the ditch, Shannon threw up her hands and yelled at him to grab the steering wheel. The evidence also shows that Hyundai is liable through either strict liability or negligence.

After reviewing all of the evidence, we hold that the evidence is legally and factually sufficient to support the jury's findings that Hyundai was 65% responsible and that Shan-

non was 35% responsible for the occurrence. Appellants' fourteenth and fifteenth points of error are overruled.

By their seventh point of error, appellants complain that the trial court erred by entering judgment favorable to Srader and Shannon because the jury findings do not support the judgment, or, alternatively, a fatal conflict exists concerning causation of damages to Srader and Shannon.

Appellees sought recovery from Hyundai on the following theories: 1) strict liability, 2) negligence, and 3) breach of warranty. Special Questions 1 and 2 relate to design defects in the Excel. The jury found that a design defect was a proximate cause of the occurrence. Special Question 3 asked for a jury finding on negligence. The jury found that Hyundai was negligent in causing damages only to Pele. Negligence and strict liability are two different causes of action. *See Gonzales,* 571 S.W.2d at 871. The jury's finding that Hyundai's negligence caused damages to Pele does not negate its finding that a design defect caused damages to Shannon and Srader. Thus, the jury's answers to Special Questions 1, 2, and 3 are not inconsistent.

We hold that the trial court did not commit error by entering judgment for Srader and Shannon. Appellants' seventh point of error is overruled.

By their sixteenth point of error, appellants attack the legal and factual sufficiency of the evidence to support the damage awards to appellees.

■ We review the sufficiency of the evidence supporting an award of damages by the same standards as any factual question. *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex. 1986). The mental process by which a jury determines the amount of damages is ordinarily not cognizable by an appellate court. *Terry v. Garcia,* 800 S.W.2d 854, 859 (Tex. App.—San Antonio 1990, writ denied). The measure of damages in a personal injury case is not subject to precise mathematical calculation. Each case must be measured by its own facts, and considerable discretion and latitude must necessarily be vested in the jury. *Mills v. Jackson,* 711 S.W.2d 427, 434 (Tex.App.—Fort Worth 1986, no writ); *Rosenblum v. Bloom,* 492 S.W.2d 321, 325 (Tex.Civ.App.—Waco 1973, writ ref'd n.r.e.). The law requires only the kind of proof of which the fact to be proved is susceptible. *Tri–State Motor Transit Co. v. Nicar,* 765 S.W.2d 486, 491 (Tex.App.—Houston [14th Dist.] 1989, no writ). Lost earning capacity that a plaintiff will suffer in the future is always uncertain and is left to the jury's sound judgment and discretion. *Id.* at 492. The jury's province is to resolve the speculative matters of pain and suffering, future pain and suffering, future disfigurement, and future physical impairment, and set the amount of damages attributable thereto. *Duron v. Merritt,* 846 S.W.2d 23, 26 (Tex. App.—Corpus Christi 1992, no writ); *Nowsco Serv. Div. of Big Three Indus. Inc. v. Lassman,* 686 S.W.2d 197, 200 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

■ The jury assessed damages, and the trial court entered judgment based on the jury's findings.[4] The trial court entered judgment in favor of Chloe Chandler, individually and as an heir of the estate of Pele Chandler, in the amount of $661,876.10.[5]

Darlene Leo testified that she had known Chloe and Pele for approximately eight years. Despite a congenital heart problem, Pele participated in normal activities. Pele wanted to attend college and become a counselor or psychologist, and she wanted to support Chloe so that Chloe could paint. After Pele's death, Chloe was unable to do anything or deal with anything.

Chloe testified that for approximately one year after Pele's death, she "lost it." She put notes on her front door saying, "Leave me alone, this means you." She would not answer her telephone and "just kind of sat."

---

4. The judgment included prejudgment interest.

5. In assessing Chloe Chandler's damages, the jury was instructed to consider pecuniary loss, loss of companionship and society, and mental anguish. In assessing Pele's damages, the jury was instructed to consider pain and mental anguish, medical expenses, and funeral and burial expenses.

Srader testified that he and Pele were taken to the hospital in the same ambulance. While in the ambulance, the attendants suctioned blood out of Pele's nose and she screamed and yelled. Pele was in severe pain all the way to the hospital. At the hospital, she let people know that she was in pain.

Dr. Everett Dillman, an economist, evaluated the damages in this case. He testified that Chloe's mental anguish and emotional pain and suffering would amount to $912,477; that Pele could have contributed $564,777 to Chloe over Cloe's lifetime; that past and future loss of companionship would amount to approximately $912,477; and that the value of life lost, based on the majority of studies, would range from $2 million to $2.5 million.

Plaintiff's Exhibit 109A showed $5,889.98 as the total amount of Pele's funeral and burial expenses. Plaintiff's Exhibit 13 showed $7,883.70 as the total amount of Pele's medical expenses.

The trial court entered judgment in favor of Srader in the amount of $163,951.44.[6] Srader testified that he hurt all over while in transit to the hospital. He suffered facial cuts and fractures and a fractured back and jaw. He had four metal plates in his left arm and three additional metal plates in other parts of his body. The left arm was weaker than it was before the collision and it caused him occasional pain. He also had back and ankle pain and a lot of scars on his face and forearms. His teeth did not mesh together like they used to, and his face was shaped differently than it was before the collision. Srader testified that his medical bills were at least $30,000.00.

The trial court entered judgment in favor of Shannon in the amount of $22,423.98.[7] Shannon testified that she sustained two broken ankles and a broken wrist. She stayed in the hospital approximately two weeks. She had pain and swelling in one ankle, depending on the pressure applied to it. In addition, foot pain upset her sleep. She had

two scars on her ankles and one scar on her shin. She occasionally used a crutch and walking caused pain. Her ability to dance was limited, and she could no longer play softball. She could not perform any work that involved standing or walking.

After considering all of the evidence, we hold that the evidence is legally and factually sufficient to support the jury's findings of damages. Appellants' sixteenth point of error is overruled.

■ By their eighth point of error, appellants complain that the charge was defective because it did not separately ask about each of the alleged defects. On appeal, they argue that the charge prevented a determination whether the verdict supported the judgment for each appellee, and that by entering judgment for all appellees, the trial court eliminated the burden on each appellee to prove his or her case. Appellees argue that appellants did not preserve their complaint to this portion of the charge.

The trial court submitted Special Questions 1 and 2 in broad form. Appellants' attorney, objecting to their submission, stated:

With respect to Issue No. 1 on manufacturing defects or design defects, we object to the extent that these are submitted generally without specific delineations of what the defects in this case are, because there is evidence that was sought to be offered in this case that exceeds the pleadings as to defects.

That same objection as far as unfit condition. It should specify which unfit condition they are talking about on Issue No. 2.

The trial court overruled appellants' objections. An objection to a charge must be made distinctly and specifically. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 938 (Tex.1980), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). We hold that the objections were sufficient to inform the trial court that Hyun-

---

6. In assessing Srader's damages, the jury was instructed to consider physical pain, loss of earning capacity, disfigurement, physical impairment, medical care, and mental anguish.

7. In assessing Shannon's damages, the jury was instructed to consider physical pain, loss of earning capacity, disfigurement, physical impairment, and medical care.

dai wanted Special Questions 1 and 2 submitted in granulated form.

■ In all jury cases, the trial court shall, whenever feasible, submit the case upon broad form questions. Tex.R.Civ.P. 277. The rule mandates broad-form submissions "whenever feasible;" *i.e.*, in any or every instance in which it is capable of being accomplished. *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The Supreme Court stated,

> The rule unequivocally requires broad-form submission whenever feasible. Unless extraordinary circumstances exist, a court must submit broad-form questions.
>
> \*　\*　\*　\*　\*　\*
>
> The standard for review of the charge is abuse of discretion, and abuse of discretion occurs only when the trial court acts without reference to any guiding principle.

*E.B.*, 802 S.W.2d at 649.

The controlling issue in this case is whether a design defect caused the occurrence in question. All appellees alleged design defects which caused the Excel to leave the road and crash into the tree. Chandler also alleged that a restraint system defect caused Pele's death. The jury's answers to Special Questions 1 and 2 yield a finding that the Excel was defective and that its defective state caused the occurrence. This is not a case in which extraordinary circumstances

required the trial court to submit Special Questions 1 and 2 in granulated form. *See E.B.*, 802 S.W.2d at 649;[8] *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 924 (Tex.1981);[9] *Brown*, 601 S.W.2d at 938.[10]

We hold that the trial court did not abuse its discretion by submitting Special Questions 1 and 2 to the jury. Appellants' eighth point of error is overruled.

By their sixth point of error, appellants complain that the trial court erroneously defined "unreasonably dangerous" as it related to design defect.

In the charge's "Instructions and Definitions" section, the trial court instructed the jury on "manufacturing defect." It then defined "unreasonably dangerous" as follows:

> You are instructed that a product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics.[11]

The trial court then instructed the jury on "design defect," as follows:

> You are instructed that a "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use.[12]

**8.** In *E.B.*, the Texas Department of Human Services sued for termination of the parent-child relationship between E.B. and her two children. The suit was based on alleged violations of Texas Family Code § 15.02(a)(1)(D), (E) and on the ground that the termination would be in the best interest of the children, § 15.02(a)(2). The trial court submitted a single question for each child under Texas Family Code § 15.02(a)(1)(D), (E), as a broad-form submission. One question read, "Should the parent-child relationship between [Respondent E.B.] and the child [E.B.] be terminated?" The jury was asked to answer yes or no. The second question was the same except for the child's initials. The Supreme Court approved of the question and stated that the charge in parental rights cases should be the same as in other civil cases.

**9.** In *Walls*, the negligence issue was whether the defendant failed to follow approved safety practices for pulling wet tubing. The Supreme Court stated that the trial court did not have to ask separate questions about each reason that defen-

dant may have failed to do so. The Court also stated that Rule 277 permits the submission of issues broadly even though they include a combination of elements or issues.

**10.** In *Brown*, the Supreme Court stated, "[W]e are not to be understood as holding that a broad submission of an issue will be reversed simply because one or more acts which contributed to the injury was not particularly pleaded or proved."

**11.** This definition governs all claims involving manufacturing defects. RESTATEMENT (SECOND) OF TORTS § 402A comment j (1965); 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 71.04 (1990).

**12.** The risk-utility standard, formulated in *Turner v. General Motors Corp.*, 584 S.W.2d 844, 847 n. 1 (Tex.1979), applies only to design and not manufacturing defects. JAMES B. SALES, PRODUCT LIABILITY LAW IN TEXAS, p. 623 n. 32 (1985).

Appellants argue that placing the definition of "unreasonably dangerous" before the "design defect" definition improperly combined the two. They asked the trial court to include the definition of "unreasonably dangerous" in the instruction on manufacturing defects to prevent the jury from using the definition in conjunction with the "design defect" definition. The trial court denied appellants' request. The jury found a design defect but did not find a manufacturing defect.

Rule 277 provides, "The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex.R.Civ.P. 277. In this case, even if we assume that the jury mistakenly applied the "unreasonably dangerous" definition relating to manufacturing defects to the definition of design defects, appellants have failed to show how they were harmed. Appellants' sixth point of error is, therefore, overruled.

█ By their seventeenth point of error, appellants complain that the trial court failed to apply Tex.Civ.Prac. & Rem.Code Ann. Chapter 33 (Vernon 1986 & Supp.1993) and use the settlement credits to reduce the amount of the judgment, since they were sued after September 2, 1987.

Prior to the signing of the final judgment, appellants objected that the tort reform amendments of Tex.Civ.Prac. & Rem.Code Ann. §§ 33.014 & 33.012 (Vernon Supp.1993) governed this case. Sections 33.014 and 33.-012 were enacted as part of the Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, 1987 Tex.Gen.Laws 37. Section 2.08 of the Act amended section 33.012 (now codified at Tex. Civ.Prac. & Rem.Code Ann. § 33.012 (Vernon Supp.1993)). Section 2.10 of the Act amended § 33.014 (now codified at Tex.Civ.Prac. & Rem.Code Ann. § 33.014 (Vernon Supp. 1993)). The Act also provided, in relevant part:

SECTION 4.05. EFFECTIVE DATE.

(a) Sections 2.01 through 2.12 and Article 3 of this Act apply only to suits

filed on or after the effective date of this Act.

(b) *If all or any part of a suit is filed before the effective date of this Act, the entire suit shall be governed* with respect to the subject matter of Sections 2.01 through 2.12 and Article 3 of this Act by the applicable law in effect before that date, and that law is continued in effect only for this purpose, including any new trial or retrial of any such suit following appeal of the trial court's judgment. (emphasis added).

The Act became effective on September 2, 1987. *See* Ch. 2, 1987 Tex.Gen.Laws at 51.

Chloe and Toby Chandler (Pele's parents) filed this suit on August 31, 1987, naming Shannon and Garry Modrell and Steak and Ale of Texas, Inc., as defendants. On July 20, 1988, the Modrells filed a third-party action against appellants. Even though appellants were not sued until after the effective date of §§ 33.014 and 33.012, section 4.05(b) provides that if "any part of a suit is filed before the effective date of this Act," then prior law governs.

We hold that the trial court did not err by failing to apply the tort reform amendments of Tex.Civ.Prac. & Rem.Code Ann. Chapter 33 to reduce the amount of the judgment. Appellants' seventeenth point of error is overruled.

█ By their fourth point of error, appellants complain that the trial court erred when it sealed and excluded admissible testimony of Jimmie Sue Felcyn.

A special master ruled before trial that Felcyn's deposition, which had not yet been taken, would be sealed and that only the trial court could open it to decide whether her answers were privileged. The special master deposed Felcyn *in camera* and sent her deposition to the trial court. Shannon and Srader asserted the psychotherapist-patient privilege.[13] The trial court read the deposi-

---

13. Tex.R.Civ.Evid. 510, dealing with "Confidentiality of Mental Health Information," provides in relevant part as follows:

(b) **General Rule of Privilege.**

(1) Communication between a patient and a professional is confidential and shall not be disclosed."

(d) **Exceptions.** Exceptions to the privilege in court proceedings exist:

tion and ruled that it was privileged. Hyundai was not allowed to use Felcyn's deposition during trial. Appellants argue that Shannon and Srader asserted the psychotherapist-patient privilege offensively, rather than defensively, which lies outside the scope of TEX.R.CIV.EVID. 510.

In *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105 (Tex.1985), the plaintiff filed a trespass to try title suit against Ginsberg, contesting the validity of two deeds executed in 1972. The plaintiff subsequently revealed that she had been treated by a psychiatrist in 1972 and subsequent years. When Ginsberg sought the psychiatrist's records, the plaintiff objected that the records were protected by the psychotherapist-patient privilege. The psychiatrist's records showed that in 1972, the plaintiff told the psychiatrist that the property had been sold. The Supreme Court, holding that the privilege was waived, stated:

> The justification for this privilege lies in the policy of encouraging the full communication necessary for effective treatment of a patient by a psychotherapist. [citation omitted.] The protection against disclosure of confidences is primarily erected to protect the patient against an invasion of his privacy. [citation omitted.]
>
> [The plaintiff] occupies a different position in relation to the privilege she attempts to assert. She has invoked the jurisdiction of the courts in search of affirmative relief against Ginsberg; yet she would attempt, on the basis of privilege, to deny Ginsberg the benefit of evidence which would materially weaken or defeat her claims against him. This is offensive, rather than defensive, use of the privilege, and it lies outside the intended scope of Tex.R.Evid. 510 and its predecessor, Tex. Rev.Civ.Stat.Ann. art. 5561h.

\* \* \* \* \* \*

"A plaintiff cannot use one hand to seek affirmative relief in court and with the other lower an iron curtain of silence against otherwise pertinent and proper questions which may have a bearing upon

his rights to maintain his action." [citation omitted.]

*Ginsberg*, 686 S.W.2d 105, 107–8.

The Supreme Court recently held that the "*Ginsberg* offensive use waiver" also applies to the attorney-client privilege. *Republic Ins. Co. v. Davis*, 856 S.W.2d 158 (Tex.1993). The court stated that the following factors should guide a trial court in determining whether a waiver of privilege has occurred:

> First, before a waiver may be found the party asserting the privilege must seek affirmative relief. [footnote omitted]. Second, the privileged information sought must be such that, if believed by the fact finder, in all probability it would be outcome determinative of the cause of action asserted. Mere relevance is insufficient. A contradiction in position without more is insufficient. The confidential communication must go to the very heart of the affirmative relief sought. Third, disclosure of the confidential communication must be the only means by which the aggrieved party may obtain the evidence. [footnote omitted]. If any one of these requirements is lacking, the trial court must uphold the privilege. [footnote omitted].

*Id.* at 163.

Felcyn's deposition testimony shows that she was a counselor affiliated with the Palmer Drug Abuse Program. She began counseling with Shannon approximately one year before the accident. Shannon did not have a drug or alcohol problem. Felcyn counselled with her concerning normal, everyday, teenage issues. Felcyn also counselled with Srader. Her counselling with Srader was limited, but when she met him, he had been sober close to a year. Felcyn was asked what Shannon told her about the collision, and she replied that either Shannon or Srader had informed her that "Shannon was being silly and playing with the wheel and overswerved and *panicked* and went to step on the brakes and instead stepped on the gas and hit the tree." Felcyn also stated, "My impression was that it was her birthday and

---

(5) as to a communication or record relevant to an issue of the physical, mental or emotional condition of a patient in any proceeding in which any party relies upon the condition as a part of the party's claim or defense.

they were just all having a good time and being silly." Felcyn testified that these remarks were made to her during a counseling session when she was trying to find out what had happened and how they felt about the accident. Felcyn wanted to find out how the collision occurred to help process guilt.

Appellees sought affirmative relief against Hyundai. If the jury had been allowed to hear and believed the privileged communications, in all probability this evidence would have been outcome determinative of the cause of action asserted. This confidential communication goes to the very heart of appellees' suit because it relates to the cause of the collision. Appellees are attempting, on the basis of privilege, to deny Hyundai the benefit of evidence which would materially weaken or defeat their claims against Hyundai. This is an offensive, rather than a defensive, use of the privilege, which lies outside the scope of Tex.R.Civ.Evid. 510. *See Ginsberg,* 686 S.W.2d at 107. This evidence was not available from any other source. Accordingly, we hold that the trial court erred by excluding the testimony of Jimmie Sue Felcyn. In addition, we hold that the trial court abused its discretion by sealing the deposition because the denial of proper discovery constitutes a "clear abuse of discretion." *Ginsberg,* 686 S.W.2d at 108.

We now must determine whether the error was harmful under Tex.R.App.P. 81(b)(1). To obtain reversal of a judgment based on error in the admission or exclusion of evidence, appellants must show that the trial court did in fact commit error, and that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989); *Downen v. Texas Gulf Shrimp Co.,* 846 S.W.2d 506, 512 (Tex.App.—Corpus Christi 1993, writ denied); Tex.R.App.P. 81(b)(1). Generally, reversible error does not exist for erroneous rulings when the evidence in question is cumulative and not controlling on a material issue dispositive of the case. *Gee,* 765 S.W.2d at 396; *Downen,* 846 S.W.2d at 512.

Felcyn's statements, which place the blame on Shannon, go to the controlling issue of the case; *i.e.,* what caused the Excel to go out of control. We hold that the exclusion of Felcyn's deposition probably caused the rendition of an improper judgment against Hyundai. Appellants' fourth point of error is sustained.

By their eighteenth point of error, appellants complain that the trial court erred when it failed to apply Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § (6)(a) (Vernon 1987 & Supp. 1993) to calculate prejudgment interest, since it was sued after September 2, 1987. Article 5069–1.05 § 6(a) was enacted as part of the Act of June 16, 1987, 70th Leg., 1st C.S., ch. 3, 1987 Tex.Gen.Laws 51. Section 3(a) and (b) of the Act provide as follows:

(a) This Act applies only to:
(1) an action commenced on or after the effective date of this Act; or
(2) a new trial or retrial following appeal of the trial court's judgment in an action commenced before the effective date of this Act.
(b) An action commenced before the effective date of this Act, other than an action included under Subsection (a) of this section, is governed with respect to the subject matter of this Act by the applicable law in effect before the effective date of this Act, and that law is continued in effect only for this purpose.

This Act became effective on September 2, 1987. *See* ch. 3, 1987 Tex.Gen.Laws at 52.

We decline to discuss this point of error since we are remanding this case for a new trial and ch. 3, 1987 Tex.Gen.Laws, § 3(a)(2) requires the trial court, "on retrial following an appeal of the trial court's judgment," to apply article 5069–1.05 § 6(a) to calculate prejudgment interest on any future judgment. *See* ch. 3, 1987 Tex.Gen.Laws, § 3(a)(2).

Due to our disposition of this case, it is unnecessary to discuss appellants' remaining points of error or Shannon's cross-points of error. *See* Tex.R.App.P. 90(a).

We REVERSE the trial court's judgment and REMAND the case to the trial court for a new trial.

DORSEY, J., dissenting.

DORSEY, Justice, dissenting.

I disagree with the majority's conclusion and analysis that information contained in a mental health counselor's file is discoverable and admissible in this case. The majority applies literally the three part test announced by the Supreme Court in *Republic Insurance Co. v. Davis*, 856 S.W.2d 158 (Tex. 1993), and finds: 1) the plaintiff sought affirmative relief by seeking damages from the defendants, 2) the statement made by the plaintiff to the counselor has great relevance and could well determine the outcome of the case, and 3) the information is not available from other sources.

The Supreme Court's decision in *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (Tex.1985), is the genesis of the Texas rule that one may waive a privilege by using it offensively. I believe the doctrine is misapplied in the case under consideration.

The majority's test of "affirmative relief" is our point of departure. I would hold that the affirmative relief sought must have some relationship to the counseling or treatment sought or received by the patient. That a party seeks any affirmative relief from the court should not constitute a waiver of the privilege. The position of the majority, based on a strict reading of *Ginsberg* and *Republic*, has the result that any plaintiff seeking damages or injunctive relief imperils the secrecy of her talks with her therapist, even though her suit is not related to her treatment or counseling. Thus, anyone seeking access to the courts of this state for the redress of grievances, whether it be for contract, trespass, tort, family law matters, or for any other relief, opens her psycho-therapist's files for review by strangers. This is not the law, nor should it be.

Rule 510 of the Texas Rules of Civil Evidence recognizes the confidentiality of mental health information, and states the general rule of privilege, who may claim it, and the exceptions to the privilege. Rule 510(d)(5) states an exception to the privilege of non-disclosure: when the communication is "relevant to an issue of the physical, mental or emotional condition of the patient in any proceeding *in which any party relies upon the condition as a part of the party's claim or defense."*

The present language of Rule 510(d)(5) was adopted by the Supreme Court in 1988. The version it superseded in 1984 had the same requirement that the condition be relied on as an element of the claim or defense. *See* TEX.R.CIV.EVID. 510 and accompanying Historical Notes. The rule as originally adopted by the court in 1983 required the patient to attempt to recover damages for a mental condition.

A privilege may be waived by using it offensively; however, there is no need to apply the doctrine when the privilege itself has exceptions. To apply the offensive use doctrine unnecessarily causes confusion in the law, but also, when it is applied improperly, as here, destroys the privilege.

To hold, as the majority does, that the plaintiff has waived the privilege by seeking affirmative relief in the courts is to render the provisions of Rule 510(d)(5) worthless. Both the doctrine announced in *Ginsberg*, as explained in *Republic*, and the Rules of Civil Evidence are rules made by the Supreme Court. They should be harmonized so each may be given effect if possible.

In *Republic Insurance Co. v. Davis*, 856 S.W.2d at 163, the Supreme Court addressed the issue of whether the "offensive use" waiver applied to the attorney-client privilege. It held it did and expounded the three criteria to be applied. However, although the Texas Rules of Civil Evidence provide for the lawyer-client privilege in Rule 503, there is no "offensive use" exception expounded in Rule 503 as there is in Rule 510. The litigant's actions did not fall within one of the exceptions which are part of the formulation of the pertinent privilege. *See* 1 STEVEN GOODE, OLIN G. WELLBORN III & M. MICHAEL SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 511.2 (Texas Practice 1993). To hold that a privilege is waived is to determine its applicability on an *ad hoc* basis with an objective of fairness.

Even when the privilege of confidential communications has been held to have been waived under the "offensive use" doctrine, the party asserting the privilege has first

based their claim for legal relief on a matter later claimed to be privileged so the other party could not reach it. There must be some connection, or nexus, between the claim for relief and the privileged matter. *See Ginsberg*, 686 S.W.2d at 108; *West v. Solito*, 563 S.W.2d 240 (Tex.1978) (orig. proceeding); *Valero Energy v. M.W. Kellogg Constr.*, 866 S.W.2d 252, 255–56 (Tex.App.—Corpus Christi 1993, writ denied); *Westheimer v. Tennant*, 831 S.W.2d 880 (Tex.App.—Houston [14th Dist.1992, orig. proceeding); *Betts v. Martin*, 798 S.W.2d 366 (Tex.App.—Beaumont 1990, orig. proceeding), *writ dism'd, improvidently granted*, 806 S.W.2d 222 (Tex. 1991); *Kentucky Fried Chicken Nat'l Management Co. v. Tennant*, 782 S.W.2d 318 (Tex.App.—Houston [1st Dist.] 1989, orig. proceeding); *Parten v. Brigham*, 785 S.W.2d 165, 167–68 (Tex.App.—Fort Worth 1989, orig. proceeding); *DeWitt and Rearick, Inc. v. Ferguson*, 699 S.W.2d 692, 694 (Tex. App.—El Paso 1985, orig. proceeding).

In *Ginsberg*, the plaintiff attacked her own deed, saying that she had been tricked and didn't know what she had been doing. She put her mental processes into issue and then resisted the defendant's efforts to probe her mental state through her mental health records. Her mental state was an issue she created, and she should not be able to shield the best evidence of it, the professional's records.

Such a situation does not exist here. Before the auto accident made the subject of this action, Shannon and Srader sought counseling for a substance abuse problem. After the accident, they continued to counsel with Felcyn, the therapist. In those sessions, they discussed the collision and their emotions in its aftermath. Among other things, they spoke about the driver's behavior immediately prior to the collision which Hyundai claims negates its liability for any product defect. Neither patient is making a claim for mental anguish. There is no connection between their treatment or counseling and the affirmative relief they seek in the courts. Their privilege of confidentiality with their therapist should not be violated in the absence of such a nexus.

I respectfully dissent. I would affirm the judgment.